JO-ANN STORES, INC. *v.* PROPERTY
OPERATING CO., LLC
(AC 25694)

Lavery, C. J., and Flynn and Dupont, Js.

Argued March 30—officially released August 30, 2005

*Edwin L. Doernberger*, with whom was *Pamela T. Harvey*, for the appellant (defendant).

*James M. Ruel*, with whom, on the brief, was *John F. X. Peloso, Jr.*, for the appellee (plaintiff).

*Opinion*

FLYNN, J. The defendant, Property Operating Co., LLC, appeals from the judgment of the trial court finding it liable to the plaintiff, Jo-Ann Stores, Inc., on a theory of unjust enrichment and awarding the plaintiff $206,741.15 in damages, plus taxable costs. On appeal, the defendant claims that the court (1) made several erroneous findings, (2) improperly determined that the defendant had been unjustly enriched, (3) improperly ruled that the plaintiff did not waive its rights and (4) improperly awarded damages to the plaintiff and failed to award damages to the defendant on its counterclaim. We affirm the judgment of the trial court.

The following facts and procedural history, as reflected in the record, are relevant to this appeal.[1] On

---

[1] In order to avoid any potential confusion on part of the reader due to the similarity in names of the tenants, subtenants and the subdivision of the original 16,300 square feet of anchor tenant space, we have charted the chronicle as follows:

| Pre-April 15, 1991 | Clothing Super Store leases the entire 16,300 square feet of the anchor tenant's space from the defendant. |
| April 15, 1991 | Defendant leases satellite store to plaintiff, naming Clothing Super Store as the anchor tenant. |

April 15, 1991, the parties entered into a lease (the lease) for commercial space in a shopping center located in Wallingford (plaza). The lease specifically named Clothing Super Store as the anchor tenant. An anchor tenant in a shopping center is a major retail tenant whose business attracts sufficient shoppers to create a spillover trade for other smaller satellite stores that occupy space in the center. The issues in this case arise out of § 15 of the lease, which concerns the anchor tenant in the plaza. That section permits a diminution in the tenant's rent if the anchor tenant ceases to do business and is not replaced by a comparable substitute tenant that uses the anchor tenant space for a first class retail

| Pre-September, 1996 | Clothing Super Store assigns its 16,300 square foot space to Clothing Liquidation Center. | |
|---|---|---|
| September, 1996 | Clothing Liquidation Center doing business as Kid's Clothing Outlet subleases 12,000 square feet of the anchor tenant's space to J.J., LLC, doing business as Curley's Children's World With a Twist (Curley's), and Curley's operates in the 12,000 square foot area. | Kid's Clothing Outlet sells clothing in the remaining 4300 square foot area. |
| 1997 | Clothing Liquidation Center subleases the remaining 4300 square feet to Curley's and Curley's occupies the entire 16,300 square feet of the anchor tenant's space. Curley's operates a day care center in the entire 16,300 square feet space on weekdays from 7 a.m. to 5:30 p.m., and at 5:30 p.m. Curley's would open for business in the 12,000 square foot area. | Kid's Clothing Outlet ceases to do business in any of the anchor tenant's space and moves to a different space in the plaza. |
| Post-February, 2004 | One Stop Pet Shop Superstore occupies the entire 16,300 square feet of the anchor tenant's space. | |

purpose. Section fifteen refers to the plaintiff as tenant and the defendant as landlord. It states: "(a) To induce Tenant to enter into this Lease and to fulfill its obligations hereunder, Landlord covenants and warrants that it has entered into a binding lease (cancellable only in the event of the tenant's default or condemnation) for the use and occupancy of Clothing Super Store (the 'Anchor Tenant'). In the event that, at any time during the Initial Term and any extended term, the Anchor Tenant shall not be open for business with retail customers, Tenant shall be obligated to pay only Substitute Rent, as defined in Section 14 hereof, for so long as such vacancy or cessation continues. In the event said vacancy or cessation continues for a period of six (6) months and is not corrected by the replacement of said Anchor Tenant with a comparable substitute tenant which uses and occupies said Anchor Tenant's space for a first class retail purpose (e.g., not a flea market, night club, second hand store, or a furniture store) and is open for business with customers prior to the expiration of said six (6) month period, Tenant shall have the right and option (i) to continue its tenancy upon the terms and conditions of this Lease subject to the obligation to pay only Substitute Rent until the replacement of the Anchor Tenant with a comparable substitute tenant, or (ii) to terminate this Lease by giving thirty (30) days prior written notice to Landlord. Failure to exercise (ii) above shall not waive Tenant's continuing right to do so as long as said vacancy continues." Section thirty of the lease required any waiver of the lease covenants to be in writing signed by both parties.

The lease designated Clothing Super Store, a retailer of adult clothing, as the anchor tenant. Clothing Super Store had occupied 16,300 square feet of space in the plaza at the time the plaintiff signed its lease and when it commenced occupancy in the shopping center. However, this anchor tenancy subsequently changed when

Clothing Super Store assigned its space to Clothing Liquidation Center, Inc., doing business as Kid's Clothing Outlet. The issues pertinent to § 15 of the lease arose when Clothing Liquidation Center, Inc. (Clothing Liquidation Center), in 1996, subleased to J.J., LLC, doing business as Curley's Children's World With a Twist (Curley's), a children's recreation center that also served fast food. In the 12,000 foot area, Curley's operated a children's recreation center that included an indoor playground, redemption games, two birthday party rooms and a dining area that measured fifty feet by twenty feet, where it served fast food items such as pizza and hot dogs. Books and stuffed animals were sold in an area in the front portion of the store measuring only fifty feet by twenty feet. Approximately one year later, in an amendment to the sublease dated July, 1997, Clothing Liquidation Center subleased the remaining 4300 square feet of the anchor tenant space to Curley's. Under this amendment, Kid's Clothing Outlet was permitted to continue operating in 1500 square feet of the 4300 square foot space until it was able to find alternative space in the shopping center. Also pursuant to the amendment, that remaining 1500 square feet was to be assumed completely by Curley's by December 1, 1997. Curley's operated Kid's Care Child Development Center (day care center), a day care center, in the 4300 square feet that it had subleased in 1997. The day care center, which did not sell items to the public, used not only its 4300 square foot space, but also the entire 12,000 square feet of Curley's space on weekdays from 7:00 a.m. until 5:30 p.m. The day care center ceased business at 5:30 p.m. on weekdays, and at that time Curley's would open for business. During the ten and one-half daily hours in which the day care center was open, it did not sell any items to the public in any portion of the total 16,300 square feet of the anchor tenant's space that it occupied.

Approximately eleven years after first signing its lease, the plaintiff filed a complaint in March, 2002, alleging that it erroneously had paid the defendant regular rent under the lease from "the departure of the Anchor Tenant" until August 1, 2001, at which time it began paying substitute rent. The plaintiff sought a declaratory judgment from the court declaring that it was required to pay only substitute rent under the lease. The plaintiff further claimed unjust enrichment. The plaintiff argues that, upon the departure of Clothing Super Store, the original anchor tenant, it was required to pay only a lesser substitute rent under the lease provision that authorized a lesser monetary payment if the anchor tenant was changed to one that was not a comparable substitute tenant using the premises leased for a first class retail purpose. Thus, the plaintiff claimed it had overpaid the defendant by paying regular rent. The plaintiff's prayer for relief claimed, inter alia, "1. A declaration that plaintiff is only required to pay Substitute Rent under the Lease. 2. An order requiring defendant to return to plaintiff all amounts paid to defendant over and above the amounts required under the lease. 3. Attorney's fees, costs and interest."

The court heard testimony and filed a written memorandum of decision on July 28, 2004. Specifically, the court found that "in September, 1996, when [Clothing Liquidation Center] doing business as Kid's Clothing Outlet (the first replacement tenant) reduced its retail space to 4300 square feet of the total 16,300 square feet originally occupied by Clothing Super Store, the combination of Curley's and Clothing Liquidation Center doing business as Kid's Clothing Outlet ceased to constitute a replacement anchor tenant as contemplated by § 15 of the lease agreement. Curley's, which occupied the majority of the 'Anchor Tenant's space,' did not qualify as a 'first class retail' establishment. From that point until the new tenant, One Stop Pet

Shop Super Store, took occupancy, the plaintiff was responsible only for 'Substitute Rent' under the lease agreement." The court awarded the plaintiff $206,741.15 plus taxable costs. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court made several improper findings. We disagree.

"The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole." (Internal quotation marks omitted.) *Putnam Park Associates* v. *Fahnestock & Co.*, 73 Conn. App. 1, 11, 807 A.2d 991 (2002).

A

The defendant first claims that the term "first class retail purpose" as used in the lease was ambiguous and that the trial court improperly determined that Curley's did not qualify as a " 'first class retail' establishment."

At the outset, we note that the lease did not simply require that any replacement tenancy be a first class retail establishment but also required that it be a "comparable substitute tenant . . . ." The court found not only that the substitute tenancy did not constitute a " 'first class retail' establishment" but also that it "ceased to constitute a replacement anchor tenant as contemplated by the lease."

Section fifteen of the lease gave the plaintiff certain rights and options, specifically that, "[i]n the event that . . . the Anchor Tenant shall not be open for business with retail customers, Tenant shall be obligated to pay only Substitute Rent . . . for so long as such vacancy or cessation continues. In the event said vacancy or cessation . . . is not corrected by the replacement of

said Anchor Tenant with a comparable substitute tenant which uses and occupies said Anchor Tenant's space for a first class retail purpose (e.g., not a flea market, night club, second hand store, or a furniture store) . . . ." The court found that "[c]ommencing in September, 1996, when Clothing Liquidation Center doing business as Kid's Clothing Outlet (the first replacement tenant) reduced its retail space to 4300 square feet of a total 16,300 square feet originally occupied by Clothing Super Store, the combination of Curley's and Clothing Liquidation Center doing business as Kid's Clothing Outlet ceased to constitute a replacement anchor tenant, as contemplated by § 15 of the lease agreement. Curley's, which occupied the majority of the 'Anchor Tenant's space,' did not qualify as a 'first class retail' establishment."

In finding that the combination of Curley's and the reduced sized Clothing Liquidation Center was not a replacement tenant as contemplated by the lease, the court implicitly found that the two stores were not comparable to Clothing Super Store. The plaintiff conceded that Clothing Liquidation Center was a first class retail establishment for as long as it did business in that space because it performed the same type of business that Clothing Super Store performed.[2] The plaintiff did not concede, however, that Clothing Liquidation Center was a comparable anchor tenant when the store reduced its space. Nevertheless, even if it were a first class retail establishment, the plaintiff's option to pay only the lesser substitute rent under the lease was triggered because Clothing Liquidation Center was not comparable to Clothing Super Store. The original anchor tenant, Clothing Super Store, occupied the entire 16,300 square feet of the anchor tenant's space

---

[2] The plaintiff conceded only that Clothing Liquidation Center was a first class retail establishment, not that Curley's was a first class retail establishment.

in which it sold adult clothing. Clothing Liquidation Center, beginning in September, 1996, when it sub-leased 12,000 square feet of its space to Curley's, sold clothing items from only 4300 square feet of the anchor tenant's space. Occupying a little over a quarter of the space previously occupied by Clothing Super Store, Clothing Liquidation Center's operation at the plaza was not comparable to that of Clothing Super Store from September, 1996.

The court found that commencing in September, 1996, the combination of Curley's and Clothing Liquidation Center ceased to constitute a replacement anchor tenant as contemplated by § 15 of the lease agreement. In 1996, Curley's entered into a sublease with Clothing Liquidation Center, and, pursuant to that sublease, Curley's occupied 12,000 square feet of the anchor tenant's space. Clothing Liquidation Center occupied the remaining 4300 square feet. Curley's was not comparable to Clothing Super Store. Curley's sold items such as stuffed animals and books in an area that measured only fifty feet by twenty feet. In the remaining area Curley's had an indoor playground, redemption games, two birthday party rooms and a general dining area that measured fifty feet by twenty feet, where it served fast food items such as pizza and hot dogs. Curley's was not comparable to Clothing Super Store, which sold clothing in the entire 16,300 square feet that it occupied.

In 1997, Clothing Liquidation Center subleased the remaining 4300 square feet to Curley's. Beginning in 1997, Curley's operated a day care center in the entire 16,300 square feet of the anchor tenant's space week-days from 7 a.m. to 5:30 p.m., and at 5:30 p.m., Curley's, the children's entertainment and discovery zone center, would open for business.[3] The day care center was not

---

[3] Linda Marra, the owner and operator of Curley's, testified that the day care center and Curley's were two separate entities.

comparable to Clothing Super Store because it did not sell any items to the public. In ordinary usage, "retail" is defined as "the sale of commodities or goods in small quantities to ultimate consumers" and "engaged in the sale of commodities at retail." Merriam-Webster Dictionary (10th Ed. 1998). It is obvious, as Kevin Beagle, the plaintiff's director of real estate, testified, that the day care center was not a retail establishment. We thus conclude our review of the court's implicit finding that the replacement tenants did not qualify as "comparable substitute tenant[s]" as the lease required when the original anchor tenant ceased business. We conclude that the court's finding that the replacement tenants "ceased to constitute a replacement anchor tenant as contemplated by § 15 of the lease agreement" was not clearly erroneous because the record clearly shows that the bulk of the space occupied by the replacement tenant was not devoted to a comparable retail use.

We next turn our analysis to the court's finding that the replacement tenants in the lease defined anchor space did not constitute a "first class retail establishment" and conclude that that finding also was not clearly erroneous.

"When construing a lease, we bear in mind three fundamental principles: (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible. . . . Where contract language is clear and unambiguous, the question of contractual intent presents a question of law for the court; otherwise, the question of contractual intent is one of fact for the ultimate fact finder." (Citation omitted; internal

quotation marks omitted.) *LMK Enterprises, Inc.* v. *Sun Oil Co.*, 86 Conn. App. 302, 306–307, 860 A.2d 1229 (2004).

"Well established principles guide our analysis in determining whether the language of a contract is ambiguous. [A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . In contrast, [a] contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) *Smithfield Associates, LLC* v. *Tolland Bank*, 86 Conn. App. 14, 18–19, 860 A.2d 738 (2004), cert. denied, 273 Conn. 901, 867 A.2d 839 (2005).

Our review of the lease supports our conclusion that the term "first class retail purpose" is ambiguous. Because the lease solely defines the term in the negative as "e.g. not a flea market, night club, second hand store, or a furniture store," rather than by a positive definition, the intent of the parties is not clear from this language. There is a reasonable basis for differences of opinion as to what was intended to be included within the term's definition. Furthermore, neither party has provided us with a clear definition, nor have we found any clear definition of this term within shopping center law. Accordingly, our standard of review is well settled.

"To the extent that the [defendant] challenges the court's interpretation of provisions in the lease that are ambiguous . . . the court's decision is a finding of fact that is reversible only if it was clearly erroneous." *Con-*

*necticut Properties Tri-Town Plaza, LLC* v. *Seymour Cinema, Inc.*, 84 Conn. App. 569, 576, 854 A.2d 756 (2004). "The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly errone-ous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *Putnam Park Associates* v. *Fahnestock & Co.*, supra, 73 Conn. App. 11–12.

We next determine, in light of the foregoing, whether the court's finding that Curley's did not qualify as a first class retail establishment was clearly erroneous. Mitchell Ryback, director of real estate for the plaza, testified on the basis of his experience that Curley's was a first class retail establishment. In contrast, Beagle testified that Curley's was not a first class retail estab-lishment. "[T]he trial court is free to accept or reject, in whole or in part, the evidence presented by any witness, having the opportunity to observe the wit-nesses and gauge their credibility." (Internal quotation marks omitted.) *Giulietti* v. *Giulietti*, 65 Conn. App. 813, 878, 784 A.2d 905, cert. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001).

In *Kowalsky Properties, Inc.* v. *Sherwin-Williams Co.*, 7 Conn. App. 136, 508 A.2d 43 (1986), which con-cerned an action to recover rent allegedly due under a certain provision in the parties' lease for premises located in a shopping center, there was a dispute between the parties as to what they intended to be the definition of the term "retail sales" under their lease agreement. Under the lease, if the annual retail sales were a specified amount, then the rental payments

under the lease would increase a specified amount above the base rental payments. In that case, we determined that what the parties intended by use of the term "retail sales" in their lease was "a question of fact solely within the province of the trier. Where the parties contend for different meanings, the resolution of the disputed issue by the trier is the ultimate manifestation of [the trier's] function." Id., 139–40.

The defendant argues that the plaintiff did not present *any* evidence as to the meaning of the term "first class retail purpose," but, instead, solely relied on the lease. Regardless of the lack of definition, there was evidence presented by both sides as to whether Curley's was a first class retail establishment. After hearing this evidence, the court, in its memorandum of decision, concluded that Curley's did not qualify as a first class retail establishment without providing a definition of the term. Nevertheless, on the basis of our review of the record, we cannot conclude that whatever definition used by the court, although not expressed in its memorandum of decision, was clearly erroneous.

The defendant certainly could have asked for an articulation of the court's definition of this term but did not. Without this articulation, and after reviewing the record, we are not left with the definite and firm conviction that a mistake has been committed. We conclude, therefore, that the court's determination that Curley's was not a first class retail establishment was not clearly erroneous.

### B

The defendant next claims that Clothing Super Store was always open for business in the plaza, and the court erroneously determined that it ceased doing business in the plaza. Specifically, the defendant contends that because § 15 of the lease states that "[i]n the event that . . . the Anchor Tenant shall not be open for business

with retail customers, Tenant shall be obligated to pay only Substitute Rent . . . for so long as such vacancy or cessation continues" and because Clothing Super Store never closed its business operations, but instead changed its name to Kid's Clothing Outlet, the court erroneously determined that the provision in the lease allowing for substitute rent to be paid by the plaintiff was triggered. We are not persuaded.

The defendant contends that Clothing Super Store never ceased doing business in the plaza, but rather converted its operations from the sale of adult clothing to the sale of children's clothing and created a new division of its operations called Kid's Clothing Outlet, and both parties agree that Kid's Clothing Outlet still was operating in the plaza at the time of trial. Ryback testified to that effect on behalf of the defendant. However, the plaintiff entered evidence from which the court could have determined that Clothing Super Store, for all intents and purposes, ceased doing business in the plaza. According to the plaintiff's exhibit three, Clothing Super Store assigned its space to Clothing Liquidation Center. The plaintiff's exhibit three contained a sublease under which Curley's obtained the lion's share of 12,000 square feet of the anchor tenant space from Clothing Liquidation Center and a second amendment to the sublease by the same parties under which Curley's obtained the remaining 4300 square feet of the anchor tenant's space. The court determined that Clothing Liquidation Center was the first replacement tenant to occupy the 16,300 square feet in the plaza originally occupied by Clothing Super Store. Implicitly, therefore, the court found that Clothing Super Store had ceased doing business in the plaza. The court had conflicting evidence before it, and in such circumstances, "we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility

of witnesses." (Internal quotation marks omitted.) *Cavolick* v. *DeSimone*, 88 Conn. App. 638, 646, 870 A.2d 1147, cert. denied, 274 Conn. 906, 876 A.2d 1198 (2005). Therefore, because the court had evidence before it from which it could have concluded that Clothing Super Store, for all intents and purposes had ceased doing business in the plaza, we cannot conclude that its factual finding in that regard was clearly erroneous.

## II

The defendant next claims that the court improperly held that it was unjustly enriched by the plaintiff's payment of regular rent, rather than the lesser substitute rent, between September, 1996, and August, 2001. Specifically, the defendant contends that the plaintiff did not suffer any detriment by the changes in the plaza but, rather, increased its sales during the period for which it claims to be entitled to equitable relief. We are not persuaded.

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment. . . .

"Furthermore, the determinations of whether a particular failure to pay was unjust and whether the defendant was benefited are essentially factual findings for the trial court that are subject only to a limited scope of review on appeal. . . . Those findings must stand, therefore, unless they are clearly erroneous or involve an abuse of discretion." (Citations omitted; internal quo-

tation marks omitted.) *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 282–83, 649 A.2d 518 (1994).

In order to determine whether the court properly held that the defendant was unjustly enriched, we must first examine the language of the lease to see what circumstances trigger the option to pay substitute rent. Our review of unambiguous provisions of a lease is plenary, while our review of ambiguous lease provisions is governed by the clearly erroneous standard of review. See *Connecticut Properties Tri-Town Plaza, LLC* v. *Seymour Cinema, Inc.*, supra, 84 Conn. App. 576.

Section fifteen of the lease gives the plaintiff, inter alia, the option to pay substitute rent "[i]n the event said vacancy or cessation continues for a period of six (6) months and is not corrected by the replacement of said Anchor Tenant with a comparable substitute tenant which uses and occupies said Anchor Tenant's space for a first class retail purpose . . . ." The lease is unambiguous in its requirement that the option is triggered if the anchor tenant is not replaced by a comparable substitute tenant that uses the anchor tenant's space for a first class retail purpose.

In September, 1996, Curley's occupied 12,000 square feet of the anchor tenant's space and Clothing Liquidation Center reduced its retail space to 4300 square feet. The court awarded the plaintiff $206,741.15 in damages on the basis of its finding that the combination of Curley's and Clothing Liquidation Center ceased to constitute a replacement anchor tenant, as contemplated by § 15 of the lease.

There was evidence adduced at trial to support the court's ultimate finding of unjust enrichment and the court's factual underpinnings of that finding. First, as previously discussed in this opinion, the court found that Curley's was not operating for a first class retail

purpose. Second, the evidence further demonstrated that the combination of Curley's and Clothing Liquidation Center was not a comparable replacement anchor tenant, as contemplated by § 15 of the lease. The combination of those two stores was not comparable to Clothing Super Store, as required by the lease. Although Clothing Super Store, a retailer of clothing, occupied 16,300 square feet, Curley's retail space was considerably less. Linda Marra, who was the owner and operator of Curley's, testified that the general dining area was fifty feet by twenty feet and the retail space, where books and stuffed animals were sold, was fifty feet by twenty feet. Because there was evidence that the plaintiff was required to pay only substitute rent from September, 1996, until August, 2001, the court's finding that its payment of regular rent during that time amounted to an unjust enrichment was not clearly erroneous. The court, from the evidence before it, could have concluded that the payment of regular rent rather than the lesser substitute rent for that period constituted an overpayment that was a benefit to the defendant to which it was not entitled. We cannot conclude, therefore, that the trial court abused its discretion in determining that the defendant was unjustly enriched by the plaintiff's payments of regular rent or that its determination was clearly erroneous.

We now address the remaining aspect of the defendant's claim,[4] i.e., that the court's determination that

---

[4] The defendant also contends that the plaintiff had accepted either Curley's or Staples, Inc. (Staples), another retail tenant located elsewhere in the plaza, as a substitute anchor tenant. The court as trier was free to determine what evidence to credit. It made no finding that the plaintiff accepted Curley's or Staples as a substitute tenant.

The defendant also argues that when Staples began its operation at the plaza in 1994, Staples became the actual anchor tenant. The court found that "[t]he rental of other space in the shopping center to Staples is irrelevant to the determination of what constitutes an anchor store. The 'Anchor Tenant's space' is the only relevant space under § 15 of the lease." In determining whether a party is entitled to unjust enrichment, "the trial court may accordingly balance the equities and take into account a variety of

the defendant had been unjustly enriched was improper because the plaintiff suffered no detriment by the changes in the plaza. Specifically, the defendant contends that the plaintiff's sales increased during most of the period when it claims to be entitled to equitable relief. That argument is somewhat misleading. Section fifteen of the lease does not mention sales revenues. The plaintiff's option to pay substitute rent is triggered if the named anchor tenant is not open for business with retail customers and is not replaced by a comparable substitute tenant which uses the anchor tenant's space for a first class retail purpose. Once those triggering conditions occurred, the plaintiff was obligated under the lease to pay only substitute rent.

Moreover, the plaintiff suffered a detriment because it paid regular rent when it was required to pay only substitute rent. The plaintiff paid the defendant more money than was required under the terms of § 15 of the lease, and the defendant retained that money, to which it was not entitled under the terms of the lease, and failed to return the excess amount to the plaintiff. Because, from the evidence, the court reasonably could have found that retention of the excess paid was inequitable and that the defendant was unjustly enriched, we conclude that that determination was not clearly erroneous or an abuse of the court's discretion.

## III

The defendant next claims that the plaintiff waived its right to pay substitute rent and that the court improperly

competing principles to determine whether the defendant has been unjustly enriched." (Internal quotation marks omitted.) *Montanaro Bros. Builders, Inc.* v. *Snow*, 4 Conn. App. 46, 53, 492 A.2d 223 (1985). The relief granted is compatible with the equities of the case simply because, as the court stated, the lease refers only to the anchor tenant's space. Therefore, the addition of Staples to the plaza was irrelevant in the determination of whether the plaintiff's option to pay substitute rent under the lease was triggered.

found that no waiver occurred. Specifically, the defendant contends that the plaintiff had direct knowledge of the changes in the plaza that occurred beginning in 1996, yet, it was not until almost five years later that the plaintiff expressed dissatisfaction with Curley's as a replacement tenant. The plaintiff, however, argues on appeal, as it did unsuccessfully before the trial court, that the defendant failed to plead waiver as a special defense and, therefore, that the trial court, which expressly found that there was no waiver, should have refused to take evidence on or address the issue. We agree with the plaintiff.

"Waiver is an intentional relinquishment or abandonment of a known right or privilege." (Internal quotation marks omitted.) *Ace Equipment Sales, Inc.* v. *H. O. Penn Machinery Co.*, 88 Conn. App. 687, 694, 871 A.2d 402, cert. denied, 274 Conn. 909, 876 A.2d 1200 (2005). Here, the court expressly found no waiver. Although the defendant argues that the plaintiff waived any right to pay substitute rent, we conclude that whether the requirements of waiver were met was irrelevant because the defendant failed to plead waiver as a special defense and the plaintiff objected to the defense being raised during trial.

"[W]aiver, as a special defense, must be specifically pleaded." *Traggis* v. *Shawmut Bank Connecticut, N.A.*, 72 Conn. App. 251, 263, 805 A.2d 105, cert. denied, 262 Conn. 903, 810 A.2d 270 (2002); see also W. Horton & K. Knox, 1 Connecticut Practice Book Series: Connecticut Superior Court Rules (4th Ed. 1998) § 10-50, pp. 382, 390.[5] Because the defendant did not specifically plead

---

[5] "[W]hen a matter required to be specially pleaded by a party is fully litigated at trial without objection from the opposing party, the latter's objection to the special pleading requirement is deemed to have been waived." *Parente* v. *Pirozzoli*, 87 Conn. App. 235, 241, 866 A.2d 629 (2005). This, however, was not the case. The court heard evidence of waiver and ruled in its memorandum of decision that there had been no waiver. However, the plaintiff objected to the admission of waiver evidence at trial and stated that "waiver is a special defense. It must be put in the pleadings. It

the defense of waiver, it was not properly before the trial court.

"A defendant's failure to plead a special defense precludes the admission of evidence on the subject. . . . It would be fundamentally unfair to allow any defendant to await the time of trial to introduce an unpleaded defense. Such conduct would result in trial by ambuscade to the detriment of the opposing party." (Citations omitted; internal quotation marks omitted.) *Oakland Heights Mobile Park, Inc.* v. *Simon*, 36 Conn. App. 432, 436–37, 651 A.2d 281 (1994). The defendant did not specifically plead waiver, and, therefore, the trial court should have sustained the plaintiff's objection and should not have considered waiver.

Accordingly, we will not address the defendant's claim that the trial court improperly found that there was no waiver.

IV

The defendant next claims that the court's award of damages was improper. We disagree.

"As a general rule, the determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . Thus, we give substantial deference to the trial judge on the issue of damages." (Internal quotation marks omitted.) *Czaplicki* v. *Ogren*, 87 Conn. App. 779, 788–89, 868 A.2d 61 (2005).

A

The defendant claims that the court's award of damages, representing a retroactive reimbursement of the

was not put in the pleadings. . . . I have cases right here and . . . if it's not pled, they can't bring it up." This case, therefore, does not fit within the ambit of *Parente* v. *Pirozzoli*, supra, 235, because the plaintiff objected at trial to the admission of waiver evidence and, as a result, did not waive its objection to the defendant's failure to plead waiver as special defense.

difference between base rent and substitute rent for the period from September, 1996, to August, 2001, was clearly erroneous. Specifically, the defendant contends that Clothing Super Store never ceased its operations at the plaza and that Curley's did not open for business until November, 1996.

Marra, owner and operator of Curley's, testified at trial that Curley's had opened for business at the plaza in November, 1996, and the plaintiff concedes this in its brief. Section 15 of the lease, however, makes the plaintiff's option to pay substitute rent available "[i]n the event that . . . [Clothing Super Store] shall not be open for business with retail customers . . . ." As previously discussed, the Clothing Super Store ceased doing business in the plaza before Curley's opened for business in November, 1996. The court had evidence before it from which it could have concluded that Clothing Super Store ceased doing business in the plaza in September, 1996. Specifically, in a lease dated September, 1996, Clothing Liquidation Center subleased 12,000 square feet of its anchor tenant's space to Curley's. Accordingly, the defendant has failed to prove that the award of damages was clearly erroneous or an abuse of discretion.

B

The defendant next claims that it was entitled to an award of damages on its counterclaim. Specifically, the defendant argues that the plaintiff was obligated to pay base rent beginning in August, 2001, and because the plaintiff paid substitute rent during that time, the defendant was entitled to the difference between the base rent under the lease and the substitute rent actually paid by the plaintiff beginning in August, 2001.

In its counterclaim, the defendant sought a declaration that the plaintiff was obligated to pay base rent under the lease beginning in August, 2001. The defen-

dant claimed that it was entitled to damages because Curley's operated its business for a first class retail purpose and therefore was a comparable replacement tenant, and because Clothing Super Store never ceased operating its business at the plaza.[6]

The court determined that the plaintiff was responsible to pay only substitute rent under the lease from September, 1996, until One Stop Pet Shop Super Store[7] took occupancy. Thus, the court found for the plaintiff on the defendant's counterclaim. The plaintiff was obligated to pay only substitute rent from August, 2001, until the pet store took occupancy because Curley's was not a comparable substitute tenant. The plaintiff's option to pay substitute rent under the lease was triggered because the original anchor tenant, Clothing Super Store, ceased doing business and Curley's, which occupied the anchor tenant space, did not operate for a first class retail purpose and did not qualify as a comparable substitute tenant. Therefore, the defendant has failed to prove that the court's determination not to award the defendant damages on its counterclaim was clearly erroneous or an abuse of discretion.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[6] The defendant also argues that it is entitled to damages on its counterclaim because the plaintiff had accepted either Curley's or Staples as a comparable replacement anchor tenant for Clothing Super Store. Whether or not the plaintiff accepted Curley's or Staples is not relevant to whether the plaintiff has the option to pay only substitute rent under § 15 of the lease. See footnote 4.

[7] According to Ryback's trial testimony, Curley's stopped doing business at the plaza sometime in January, 2004, and One Stop Pet Shop Super Store, would be in the space formerly occupied by Clothing Super Store. The plaintiff stipulated that the pet store will satisfy the comparable substitute tenant provision of § 15 of the lease and plans to pay the defendant fixed rent once One Stop Pet Shop Super Store opens for business in the anchor tenant's space.