******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
*v.* ROGER ESSAGHOF ET AL.
(AC 38736)

Lavine, Mullins and Mihalakos, Js.

*Syllabus*

The plaintiff bank sought to foreclose a mortgage on certain of the defen-
dants' real property after they had defaulted on a loan that had been
modified by agreement. The original adjustable interest rate loan was
signed by the defendants in favor of W Co. and provided that the interest
rate would be recalculated monthly on the basis of the interest rates
listed in a certain monthly yield index. After making one payment, the
defendants' monthly payments were insufficient to cover the interest
accruing, which increased the principal balance of the loan and resulted
in negative amortization. One of the defendants, R, a highly experienced
real estate investor, met with W Co. about potentially modifying the
terms of the original loan. W Co. represented that, because interest rates
were rising, it would be in the defendants' best interest to modify the
loan so as to set a fixed interest rate. The defendants executed the
modification agreement to set a fixed interest rate, but thereafter
defaulted on the loan by failing to make the monthly payments. After
the plaintiff acquired W Co. and all of its assets, including the defendants'
loan, it commenced this foreclosure action, seeking a judgment of strict
foreclosure. The defendants filed special defenses of, inter alia, fraud
in the inducement and unclean hands, alleging that W Co. had induced
them into executing the modification agreement by making false repre-
sentations, concealed that its true motivation for encouraging the defen-
dants to sign the modification agreement was to benefit itself financially
by reducing its number of negative amortization loans, and insisted that
they sign the modification agreement without an attorney present. The
trial court rendered judgment of strict foreclosure, from which the
defendants appealed to this court. While the appeal was pending, the
trial court granted the plaintiff's motion for equitable relief and ordered
the defendants to reimburse the plaintiff for the property taxes and
homeowner's insurance premiums that the plaintiff paid during the pend-
ing appeal, and the defendants filed an amended appeal. *Held*:

1. The trial court's finding that the defendants were not fraudulently induced
   into executing the modification agreement was not clearly erroneous:
   the record provided ample support for the court's finding that W Co.'s
   representations were not false, as that court correctly found that, on
   the basis of the monthly yield index, rates had risen during the four
   month period in which W Co. had told R that they were increasing, and,
   therefore, notwithstanding the fact that interest rates were in an overall
   period of decline, W Co.'s representations about rising interest rates
   were not false; moreover, the record supported the court's finding that
   the defendants had failed to prove that W Co. was motivated by a policy
   to convert negative amortization loans, and this court would not disturb
   the trial court's finding that the defendants' were not pressured into
   signing the modification agreement, as it was based on that court's
   determination that R's testimony was not credible given his experience
   as a real estate investor.

2. The trial court did not abuse its discretion in declining to apply the
   doctrine of unclean hands to the present case; the defendants' special
   defense of unclean hands was predicated on the same alleged miscon-
   duct on which the defendants relied to establish their fraudulent induce-
   ment special defense, which this court already rejected and found did
   not amount to misconduct, and the trial court properly found that the
   defendants had failed to establish a factual predicate for a defense of
   unclean hands.

3. The trial court did not abuse its discretion in determining that a balancing
   of the equities justified ordering the defendants to pay the real estate
   taxes during the pending appeal; the defendants would have been
   required to pay the taxes regardless of the outcome of the appeal, and
   that court was understandably concerned that the defendants would

experience a windfall if they were allowed to live on the property for free until the conclusion of the foreclosure proceedings.

Argued April 26—officially released October 10, 2017

*Procedural History*

Action to foreclose a mortgage on certain real property owned by the named defendant et al., and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the defendant JPMorgan Chase Bank, National Association, was defaulted for failure to appear; thereafter, the matter was tried to the court, *Hon. Kevin Tierney*, judge trial referee; judgment of strict foreclosure, from which the named defendant et al. appealed to this court; subsequently, the court, *Hon. Kevin Tierney*, judge trial referee, granted the plaintiff's motion for reimbursement of property taxes and insurance payments, and the named defendant et al. filed an amended appeal. *Affirmed.*

*Ridgely Whitmore Brown*, with whom, on the brief, was *Benjamin Gershberg*, for the appellants (named defendant et al.).

*Brian D. Rich*, with whom, on the brief, was *Peter R. Meggers*, for the appellee (plaintiff).

*Opinion*

MULLINS, J. In this foreclosure action, the defendants Roger Essaghof and Katherine Marr-Essaghof[1] appeal from the judgment of strict foreclosure, rendered after a trial to the court, in favor of the plaintiff, JPMorgan Chase Bank, National Association, and from the court's entry of a posttrial financial order. The defendants claim that the court (1) erred in rejecting their special defenses of fraudulent inducement and unclean hands, and (2) abused its discretion in ordering them to reimburse the plaintiff for property taxes paid by the plaintiff during the pendency of this appeal. We affirm the judgment of the trial court.

The following facts, as found by the court in its November 27, 2015 memorandum of decision,[2] and procedural history are relevant to this appeal. On May 11, 2006, the defendants executed an adjustable rate promissory note (original note) in favor of Washington Mutual Bank, F.A. (Washington Mutual) in exchange for a loan in the amount of $1,920,000. The original note was secured by a mortgage on the defendants' property located at 19 Bernhard Drive in Weston.

The original note required monthly payments of $7736.90 and provided that, from the date the note was executed until June 1, 2006, any unpaid principal would be subject to a yearly interest rate of 8.856 percent. During the month of June, 2006, the yearly interest rate would be 2.65 percent. On July 1, 2006, and on the first day of every month thereafter (change date), the interest rate would be recalculated to conform to the current interest rates set forth in an index published by Federal Reserve Board entitled "Selected Interest Rates (H.15)" (monthly yield index). On each of these change dates, the new interest rate would be calculated by adding 4.713 percentage points to the applicable rate set forth in the monthly yield index. The original note also provided that on July 1, 2007, and on that date every year thereafter (payment change date), the defendants' monthly payment would be recalculated to reflect the amount necessary to pay the balance of the loan in full by the maturity date—June 1, 2036—at the interest rate that was in effect forty five days prior to the payment change date. The monthly payments, however, could not increase or decrease on any payment change date by more than 7.5 percent.

Given the interest rates, the defendants' first monthly payment of $7736.90 on June 1, 2006, reduced the principal balance by a few thousand dollars. Every month thereafter, however, their payments of $7736.90 were insufficient to cover the interest, causing the principal balance to increase at a compounding rate.[3] To account for this negative amortization, the original note provided that the defendants' "unpaid principal can never exceed a maximum amount equal to 110 [percent] of the

principal amount [of $1,920,000] original[ly] borrowed." Once the defendants' principal balance reached the cap, which was $2,112,000, their monthly payments would increase to the amount necessary to pay the balance in full by the June 1, 2036 maturity date even if that required their payments to increase by more than 7.5 percent.

In early 2008, Roger Essaghof, a highly experienced real estate investor who had negotiated numerous residential and commercial mortgages, began meeting with Washington Mutual on a regular basis about potentially modifying the terms of the original note. During those meetings, Washington Mutual represented that modifying the note to a fixed interest rate was in his best interest because interest rates were rising. The defendants executed a modification on June 24, 2008 (modification agreement), which provided that, as of May, 2008, the principal balance on the original note was $2,043,190.89. It also changed the loan from an adjustable interest rate to a fixed annual rate of 6.625 percent. The modification also required monthly payments of $11,280.12, which were sufficient to cover the accrued interest but not any principal.

Had the defendants' loan remained subject to the adjustable interest rates as required by the terms of the original note, their principal balance would have reached the $2,112,000 cap no later than August 1, 2009. Once that occurred, their monthly payments would have almost doubled from $7736.90 to $14,061.60—the amount needed to pay the loan in full by the June 1, 2036 maturity date. Because of the modification agreement, however, the defendants' payments remained at $11,280.12.

Shortly after executing the modification agreement on June 24, 2008, the defendants defaulted on the loan by failing to make payments. The plaintiff acquired Washington Mutual and all of its assets, including the defendants' loan, in September, 2008, and commenced this foreclosure action against the defendants in March, 2009.

The defendants filed revised special defenses on July 22, 2011, raising the defenses of, inter alia, fraud in the inducement and unclean hands. Essentially, the defendants alleged that Washington Mutual had induced them into executing the modification agreement, which increased their monthly payments and caused their default, by making false representations that the modification was in their best interest because interest rates were rising. Furthermore, the defendants asserted that Washington Mutual never provided them with a copy of the modification agreement, insisted that they sign the modification agrement at their home without an attorney present, and concealed its true motivation for recommending that they modify their loan, which was to benefit itself financially by reducing the number of

negative amortization loans on its books. The defendants argued that these facts amounted to fraudulent inducement and unclean hands, which precluded enforcement of the note and mortgage.

Following a bench trial, the court issued a memorandum of decision on November 17, 2015, finding in favor of the plaintiff on the issue of liability. After concluding that the plaintiff was the holder of the note and mortgage, and that the defendants had defaulted by failing to make payments, the court found that the defendants failed to meet their burden of proof as to either fraud in the inducement or unclean hands. As further explained subsequently in this opinion, the court found that any representations by Washington Mutual that interest rates were increasing were not false because rates did in fact increase during the months leading up to the June 24, 2008 modification. The court also found that the defendants failed to demonstrate that Washington Mutual secretly was motivated by a desire to eliminate its negative amortization mortgages, and that the fact that the defendants executed the modification agreement at their home without an attorney present did not evince fraud or unclean hands. Accordingly, the court rendered a judgment of strict foreclosure for the plaintiff, found that the amount of the debt was $3,210,145.12, and set the law days for February 23, 2016. The defendants appealed to this court on December 16, 2015.

While the appeal was pending, the plaintiff filed a motion for, inter alia, equitable relief, in which it urged the trial court to invoke its equitable powers to order the defendants to pay for the property taxes and homeowner's insurance premiums that the plaintiff had been forced to incur during the pendency of the appeal.[4] After hearing argument and ordering supplemental briefing, the court issued a memorandum of decision dated February 23, 2016, granting the plaintiff's motion for equitable relief and ordering the defendants to pay for the property taxes and insurance premiums paid by the plaintiff during the pendency of the appeal or any time thereafter until the conclusion of litigation.

The defendants amended their appeal to include a challenge to the court's February 23, 2016 order. Additional facts and procedural history will be set forth where necessary.

I

The defendants first claim that the court erred in rejecting their special defenses of fraud in the inducement and unclean hands. We disagree.

The following additional facts and procedural history are relevant to this claim. As previously set forth, the defendants relied upon the same alleged conduct on the part of Washington Mutual to establish both fraudulent inducement and unclean hands. In particular, the defen-

dants asserted that Washington Mutual (1) lied to them that interest rates were increasing, and, therefore, that the modification would be in their best interest, when in fact interest rates were decreasing; (2) failed to disclose that the real reason it wanted them to modify their loan was to reduce its financial exposure to negative amortization mortgages; and (3) pressured them to sign the modification agreement at their home without an attorney present.

In its November 27, 2015 memorandum of decision, the court found that the defendants failed to prove any of these underlying factual allegations and rejected both special defenses. First, the court found that Washington Mutual's representations about rising interest rates were not false. At trial, Roger Essaghof testified that a representative from Washington Mutual began contacting him around April or May, 2008, and regularly represented that the rising interest rates would cause his monthly payments to increase dramatically if he did not modify the loan to a fixed interest rate. Randall Huinker, an expert in banking practices and mortgage lending, testified for the defendants that, on the basis of his review of the monthly yield index,[5] interest rates were in the midst of an overall period of decline around the time that Washington Mutual represented they were increasing. After conducting its own examination of the monthly yield index, however, the court reached the opposite conclusion. Rejecting Huinker's testimony, the court found that, consistent with Washington Mutual's representations, interest rates were indeed increasing in the four months leading up to the defendants' execution of the modification agreement on June 24, 2008. Specifically, the court noted that rates rose from 1.54 percent in March, 2008, to 2.42 percent in June, 2008, an increase of over fifty percent. Thus, the court found that Washington Mutual's representations that the interest rates were increasing "were spot on correct."

Second, the court found unpersuasive the defendants' allegation that Washington Mutual's ulterior motive for encouraging the modification was to benefit itself financially by converting its negative amortization mortgages to fixed rate mortgages. To prove this ulterior motive, the defendants relied exclusively on a document entitled "Form 10-Q," which the entity "Washington Mutual, Inc.," had filed with the United States Securities and Exchange Commission. The defendants cited to the section of Form 10-Q that refers to "fast-track loan modification," which evidently was a method developed by the American Securitization Forum for converting adjustable rate loans into other mortgage products in order to reduce lenders' exposure to widespread defaults. Form 10-Q further states that Washington Mutual, Inc., "elected to apply the fast-track loan modification provisions [developed by the American Securitization Forum] beginning in March 2008 . . . ."

The court found that Form 10-Q did not prove any alleged "system wide" scheme by Washington Mutual to convert its negative amortization loans to fixed rate loans. The court noted that, for one thing, Form 10-Q was filed by Washington Mutual, Inc., not Washington Mutual, the plaintiff's predecessor-in-interest, and there was no indication that Washington Mutual was a subsidiary of or otherwise connected with Washington Mutual, Inc. Furthermore, the court noted that Form 10-Q did not indicate whether the "fast-track" program applied specifically to negative amortization mortgages, and that the program appeared to have been developed by the American Securitization Forum, an entity that was not related to or controlled by Washington Mutual. Accordingly, the court found that the "fast-track" program "cannot be any evidence of fraud or unclean hands by Washington Mutual . . . ."

Finally, the court rejected the defendants' allegation that Washington Mutual pressured them to execute the modification agreement at their home without an attorney present, finding instead that Roger Essaghof "was an experienced investor in real property having purchased property with multiple residential commercial mortgages. He was well aware of the routine matters involving the execution of mortgage documents and the reading of mortgage documents. The court does not find [Roger] Essaghof's testimony credible that it was an act of . . . fraud . . . or unclean hands that the mortgage documents were executed [in] the comfort of his own home in the presence of his wife [Katherine Marr-Essaghof] and a Washington Mutual . . . representative without the presence of an attorney." On the basis of these findings, the court concluded that the defendants failed to meet their burden of proof with respect their defenses of fraud in the inducement and unclean hands.

With this factual basis in mind, we proceed to resolve the defendants' claims that the court improperly rejected their defenses of fraudulent inducement and unclean hands.

### A

The defendants first claim that the court erred in rejecting their defense of fraudulent inducement. "It is well settled that a trial court in foreclosure proceedings has discretion, on equitable considerations and principles, to withhold foreclosure or to reduce the amount of the stated indebtedness." (Internal quotation marks omitted.) *Bank of America, N.A.* v. *Aubut*, 167 Conn. App. 347, 378, 143 A.3d 638 (2016). Fraud, a well recognized special defense in foreclosure actions, "involves deception practiced in order to induce another to act to her detriment, and which causes that detrimental action. . . . The four essential elements of fraud are (1) that a false representation of fact was made; (2)

that the party making the representation knew it to be false; (3) that the representation was made to induce action by the other party; and (4) that the other party did so act to her detriment. . . . Because specific acts must be pleaded, the mere allegation that a fraud has been perpetrated is insufficient." (Internal quotation marks omitted.) Id., 378–79; see also *Peterson* v. *McAndrew*, 160 Conn. App. 180, 204, 125 A.3d 241 (2015). A trial court's decision as to the essential elements of fraud is subject to the clearly erroneous standard of review. *Cohen* v. *Roll-A-Cover, LLC,* 131 Conn. App. 433, 450, cert. denied, 303 Conn. 915, 33 A.3d 739 (2011).

The defendants' claim that the court erred in rejecting their defense of fraudulent inducement focuses almost entirely on the court's subsidiary factual findings.[6] Specifically, they assert that the court erroneously found (1) that Washington Mutual's representations that interest rates were increasing were not false, and (2) that they failed to prove that Washington Mutual's efforts to secure the modification were motivated by a policy to reduce the number of negative amortization mortgages on its balance sheet. "The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *Jo-Ann Stores, Inc.* v. *Property Operating Co., LLC,* 91 Conn. App. 179, 191, 880 A.2d 945 (2005).

The record provides ample support for the court's findings. With regard to interest rates, Roger Essaghof testified at trial that, around April or May, 2008, Washington Mutual's representatives told him on multiple occasions that interest rates were increasing. The court, on the basis of its review of the interest rates listed in the monthly yield index, found that these representations were not false because rates had indeed risen during that period. Our review of the monthly yield index confirms that finding. Although interest rates were in an overall period of decline from January, 2006 through September, 2011, there was a four month window of time from March through June, 2008, during which interest rates rose dramatically each month.[7] According to Roger Essaghof's testimony, it was during this window when Washington Mutual told him that interest rates were increasing. Because rates in fact were increasing during this, albeit brief, period of time, the court's finding that Washington Mutual did not make any misrepresentations regarding the state of the defendants' interest rates was not clearly erroneous.

The defendants contend that Washington Mutual's representations that rates were increasing nonetheless were false because interest rates were in an overall period of steady decline from 2007 through 2011, and the four month period in 2008 during which rates increased was merely an aberration in that overall trend. In reviewing factual findings under the clearly erroneous standard of review, however, "[w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached," but, instead, make "every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Jeisean M.*, 270 Conn. 382, 397, 852 A.2d 643 (2004). As previously explained, Washington Mutual told the defendants in April or May, 2008, that interest rates were increasing, and the monthly yield index reflects that those representations were accurate at the time they were made. Accordingly, the record provides adequate support for the court's finding, and we are not left with a definite and firm conviction that a mistake has been made.[8]

There also is adequate evidence in the record to support the court's finding that the defendants failed to prove that Washington Mutual's true motivation for obtaining the modification was to benefit itself financially by converting its negative amortization loans to fixed rate loans. To prove this allegation, the defendants relied exclusively on Form 10-Q and the references therein to a "fast-track loan modification" program for converting adjustable rate loans into other mortgage products for the purpose of reducing lenders' financial exposure to risky loans.

As the court found, however, Form 10-Q does not demonstrate Washington Mutual's participation in the "fast-track" program, much less that the program was applied to the defendants in this case. "It is axiomatic that [the] [t]he trier [of fact] is free to accept or reject, in whole or in part, the evidence offered by either party." (Internal quotation marks omitted.) *Olson* v. *Olson*, 71 Conn. App. 826, 833, 804 A.2d 851 (2002). Form 10-Q was filed by Washington Mutual, Inc., a distinct entity from Washington Mutual, and there is no evidence that the policies implemented by Washington Mutual, Inc., were binding upon or otherwise adopted by Washington Mutual. Indeed, Form 10-Q states that the "fast-track" program was developed by the American Securitization Forum, another entity whose connection to Washington Mutual was not established at trial. Nor does Form 10-Q indicate whether the "fast-track" program applies specifically to negative amortization mortgages, as the defendants claimed it did. Rather, Form 10-Q states that the program was designed to apply to "Segment 2" borrowers—those who are unable to refinance or afford their "reset rates" and for whom "default is considered to be reasonably foreseeable." There was no evidence

that the defendants had been classified as "Segment 2" borrowers prior to being approached by Washington Mutual about modifying their loan. Therefore, the court was wholly justified in rejecting the defendants' allegation that Washington Mutual concealed from them an ulterior, financial motive for obtaining the modification.

Finally, the defendants argue in their brief to this court that Washington Mutual pressured them to execute the modification agreement as quickly as possible by having them sign it at their home without an attorney present. The court, however, did not credit Roger Essaghof's testimony that the absence of an attorney or the setting in which the modification agreement was executed contributed to any alleged fraud by Washington Mutual. Because "the trial court is the arbiter of credibility, this court does not disturb findings made on the basis of the credibility of witnesses." *Ruiz* v. *Gatling*, 73 Conn. App. 574, 576, 808 A.2d 710 (2002). As the court noted, Roger Essaghof was an experienced real estate investor, had taken out several residential and commercial mortgages prior to the transaction in question, and was "well aware of the routine matters involving the execution of mortgage documents and the reading of mortgage documents." Accordingly, the court's finding that the defendants were not fraudulently induced into executing the modification agreement was not clearly erroneous.[9]

B

The court also did not err in rejecting the defendants' defense of unclean hands. "Our jurisprudence has recognized that those seeking equitable redress in our courts must come with clean hands. The doctrine of unclean hands expresses the principle that where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue. . . . For a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with clean hands. . . . The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. . . . It is applied . . . for the advancement of right and justice. . . . The party seeking to invoke the clean hands doctrine to bar equitable relief must show that his opponent engaged in wilful misconduct with regard to the matter in litigation. . . . The trial court enjoys broad discretion in determining whether the promotion of public policy and the preservation of the courts' integrity dictate that the clean hands doctrine be invoked." (Internal quotation marks omitted.) *Bank of America, N.A.* v. *Aubut*, supra, 167 Conn. App. 380.

As the defendants acknowledge in their appellate brief, they rely on the same alleged misconduct by Washington Mutual to establish their defense of unclean hands as they did to demonstrate fraudulent induce-

ment. Because we already have concluded that the court did not clearly err in finding that the defendants failed to prove that Washington Mutual engaged in any of the misconduct asserted by the defendants for purposes of their fraudulent inducement special defense; see part I A of this opinion; it follows that their unclean hands defense also must fail. This is so despite the fact that the unclean hands doctrine is subject to different legal standards than fraudulent inducement. Put simply, the court's determination that the defendants failed to establish a factual predicate for a defense under the unclean hands doctrine was not clearly erroneous. Accordingly, the court did not abuse its discretion in failing to apply the doctrine of unclean hands in the present case. See *Monetary Funding Group, Inc.* v. *Pluchino*, 87 Conn. App. 401, 406, 867 A.2d 841 (2005).

II

The defendants next claim that the court abused its discretion in ordering them to reimburse the plaintiff for real estate taxes paid by the plaintiff during the pendency of this appeal because "such an order effectively exposes the [defendants] to a threat of imprisonment for a component of the debt owed to the plaintiff and would be equivalent to the re-creation of debtors' prison." They further assert that the court issued the order "without authority or precedent" to do so and that a provision of the original note "converts these payments to debt and [is] the only remedy in a deficiency proceeding." We are not persuaded.

In its February 23, 2016 memorandum of decision, the court granted the plaintiff's motion for equitable relief and ordered the defendants to reimburse the plaintiff for the property taxes and homeowner's insurance premiums incurred by the plaintiff during the pendency of the appeal and in the future until the conclusion of litigation. The court reasoned that the defendants had been liable to pay property taxes and homeowner's insurance on their property since they mortgaged their property on May 11, 2006, and would continue to be liable for those costs even were they to prevail in their appeal before this court. The court noted that, despite the onus being on the defendants, the plaintiff had been covering the taxes and insurance expenses since 2010 in order to maintain its priority over other encumbrancers. The court noted that the expenses paid by the plaintiff from March 31, 2010 through January 14, 2016, amounted to $331,232.48. The court further found that the order was warranted notwithstanding the appellate stay because "the obligation of [the defendants] to pay the future real estate taxes . . . is not subject to the automatic stay and will not be affected by the trial court and appellate litigation."

"In an equitable proceeding, the trial court may examine all relevant factors to ensure that complete justice is done. . . . The determination of what equity requires

in a particular case, the balancing of the equities, is a matter for the discretion of the trial court." (Internal quotation marks omitted.) *People's United Bank* v. *Sargo*, 160 Conn. App. 748, 754, 125 A.3d 1065 (2015). "Although we ordinarily are reluctant to interfere with a trial court's equitable discretion . . . we will reverse [a judgment] where we find that a trial court acting as a court of equity could not reasonably have concluded as it did . . . or to prevent abuse or injustice." (Internal quotation marks omitted.) *19 Perry Street, LLC* v. *Unionville Water Co.*, 294 Conn. 611, 629–30, 987 A.2d 1009 (2010); see also *Petterson* v. *Weinstock*, 106 Conn. 436, 446, 138 A. 433 (1927) ("[o]ur practice in this [s]tate has been to give a liberal interpretation to equitable rules in working out, as far as possible, a just result"). "[Because] a mortgage foreclosure is an equitable proceeding, either a forfeiture or a windfall should be avoided if possible." *Farmers & Mechanics Savings Bank* v. *Sullivan*, 216 Conn. 341, 354, 579 A.2d 1054 (1990). "[T]he trial court must exercise its . . . equitable powers with fairness not only to the foreclosing mortgagee, but also to subsequent encumbrancers and the owner." (Internal quotation marks omitted.) Id.

We cannot conceive of any abuse of discretion on the part of the trial court. The court understandably was concerned that, absent an order requiring the defendants to pay for their own property taxes and homeowner's insurance, they would experience a windfall because they would be allowed to live on their property for free at the plaintiff's expense until the conclusion of the foreclosure proceedings.[10] Such a result plainly is within the realm of issues that the court's equitable powers were designed to address. Moreover, in their brief on appeal, the defendants do not challenge the court's reasoning that they would continue to be responsible for paying taxes and insurance on their property regardless of whether they prevailed in their appeal. The court did not abuse its discretion in determining that a balancing of the equities justified ordering the defendants to pay for expenses that they would have been required to pay no matter the outcome of this case.[11]

The judgment is affirmed and the case is remanded for the purpose of setting a new law day.

In this opinion the other judges concurred.

[1] The plaintiff, JPMorgan Chase Bank, National Association, acquired Washington Mutual Bank, F.A., the originator of the note and mortgage from which this foreclosure action arises. Washington Mutual Bank, F.A., also held a junior lien with respect to the mortgage that was foreclosed in this action and, therefore, JPMorgan Chase Bank, N.A., also is named as a defendant in this action but is not a party to this appeal. Accordingly, we refer to Roger Essaghof and Katherine Marr-Essaghof as the defendants throughout this opinion.

[2] The court originally set forth its factual findings and legal conclusions in a memorandum of decision dated October 15, 2015. After granting the defendants' motion for reargument and reconsideration, the court issued a corrected memorandum of decision on November 27, 2015.

[3] The original note provided that if the defendants' monthly payment was

insufficient to cover the interest that accrued during that month, then the unpaid interest would be added to the principal balance and interest would accrue thereon. If their monthly payment exceeded the interest, the excess would be applied towards the principal balance.

[4] In the same motion in which it sought equitable relief, the plaintiff also moved for a termination of the appellate stay pursuant to Practice Book § 61-11 (d). The court treated the motion to terminate the appellate stay as a separate motion, and denied it on February 23, 2016.

[5] The court found that, although the document admitted into evidence at trial and relied upon in determining the applicable interest rates was not the official index published by the Federal Reserve Board, it accurately reflected the interest rates contained therein.

[6] In addition to contesting the court's factual findings, the defendants argue that the court's "conclusion that [their] special defense of fraudulent inducement did not sufficiently allege the elements of fraud was legally and logically incorrect . . . ." This argument is in reference to a portion of the court's memorandum of decision in which it isolated certain factual allegations that the defendants set forth in support of each of their special defenses, including fraud in the inducement and unclean hands, and stated that those allegations "are insufficient [even if proven] to sustain the defendants' burden of proof as to any of their . . . special defenses." The import of this statement is unclear. As the defendants correctly point out, they supported their defenses of fraudulent inducement and unclean hands with additional allegations beyond those that the court stated were legally insufficient. In any case, however, our review of the court's memorandum of decision convinces us that the court's rejection of the defendants' special defenses was not based upon an erroneous belief that they failed to sufficiently plead their defenses. Rather, the court carefully considered each of the facts alleged by the defendants and determined either that those facts had not been proven at trial or that they did not amount to fraudulent inducement or unclean hands. In other words, the court's decision was based upon the evidence at trial, not the sufficiency of the defendants' pleadings.

[7] Interest rates climbed from 1.54 percent in March, 2008, to 1.74 percent in April, to 2.06 percent in May, to 2.42 percent in June, an overall increase, as the court found, of over fifty percent. Of course, Washington Mutual's representatives could not then have known that interest rates would decline after June, 2008, and the defendants have not identified anything in the record to suggest that Washington Mutual's representatives believed, contrary to their statements to the defendants, that interest rates would decline after June, 2008.

[8] That Huinker, the defendants' expert witness, considered the long-term trends in testifying that interest rates were "decreasing" does not compel a different result. The court did not credit his testimony and, given the evidence, was well within its prerogative to do so. See *Sellers* v. *Sellers Garage, Inc.*, 155 Conn. App. 635, 642, 110 A.3d 521 (2015) ("[I]t is the exclusive function of the finder of fact to reject or accept evidence and to believe or to disbelieve any expert testimony. The trier may accept or reject, in whole or in part, the testimony of an expert witness." [Internal quotation marks omitted.]).

[9] The defendants do not explicitly challenge the court's finding that they failed to prove their special defense of duress, and it is unclear to us whether the assertion in their appellate brief that Washington Mutual "pressed" them into executing the modification agreement is an attempt to raise such a challenge. In any case, even if we construed the defendants' brief as challenging the trial court's determination regarding the claim of duress, that claim fails for the same reasons that their challenges to the court's rulings on unclean hands and fraudulent inducement fail.

[10] As the court stated during the February 8, 2016 hearing on the motion, "it's not fair that the [defendants] can live in this house and not pay the real estate taxes that they're obligated to [pay even if] they win this appeal. It's not fair that they live in this house and not pay the insurance on the house that they're living in. When they win the appeal, they have to pay it. It's not fair."

[11] The defendants raise an additional argument in connection with this claim, which consists entirely of the following sentence: "Paragraph 9 of the mortgage converts these payments to debt and [is] the only remedy in a deficiency proceeding." The defendants provide no further analysis, citation to the record or legal authority to support the proposition that this paragraph of the mortgage agreement renders the court's exercise of its equitable power an abuse of discretion. "It is well settled that [w]e are not

required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Benedetto* v. *Dietze & Associates LLC*, 159 Conn. App. 874, 880–81, 125 A.3d 536, cert. denied, 320 Conn. 901, 127 A.3d 185 (2015). Accordingly, we decline to review this argument.

—————————————————————