ANDREW PARENTE *v.* MARIO PIROZZOLI, JR.
(AC 24916)

Lavery, C. J., and Flynn and Mihalakos, Js.

Argued October 25, 2004—officially released February 1, 2005

*Robert L. Hirtle*, for the appellant (defendant).

*Campbell D. Barrett*, with whom were *Kevin W. Hadfield*, certified legal intern, and, on the brief, *Jonathan*

*P. Budlong* and *C. Michael Budlong,* for the appellee (plaintiff).

LAVERY, C. J. The defendant, Mario Pirozzoli, Jr., appeals from the judgment of the trial court finding him in breach of a partnership agreement and awarding $138,000 in damages to the plaintiff, Andrew Parente. The defendant claims on appeal that the court lacked jurisdiction to enforce the agreement between the parties because the purpose of that agreement was to violate the law. We conclude that the agreement is unenforceable because it is contrary to public policy and, accordingly, reverse in part the judgment of the trial court.

The following facts, as found by the court, and procedural history are relevant to the defendant's appeal. Sometime in 1992, the owners of the Speak Easy Cafe in Berlin approached the plaintiff and offered him the opportunity to run that establishment. The plaintiff had known one of the owners and had leased space adjacent to the establishment since the mid-1970s. He was interested and decided to pursue the opportunity. The plaintiff and the owners reached an agreement whereby the plaintiff would purchase all of the liquor in stock, pay weekly rent and allow the owners to generate revenue from the amusement machines they kept in the establishment. According to the testimony of one of the owners, which the court credited, the plaintiff was the only person with whom the owners negotiated and the only one they would have allowed to operate the establishment.

Because the plaintiff previously had been convicted of a felony, he was not able to secure a liquor license. The plaintiff asked the defendant to join him in the undertaking because the latter would be able to get the license. In April, 1993, the parties agreed to work

together in some form of joint venture. Because of the plaintiff's felony conviction, all of the legal documentation associated with the business, including a real estate lease and the incorporation papers, was in the defendant's name only. The business was incorporated as Centerfolds, Inc., on June 8, 1993, with the defendant as owner, and the parties began running the establishment in July, 1993. They generally had divided responsibility for the duties involved with the business.

At about that time, the plaintiff's attorney drafted a comprehensive partnership agreement to govern the parties' relations. That agreement, however, was never signed. A less comprehensive agreement[1] was prepared in early 1995 and was executed by the parties.[2] In August, 1998, the defendant, without consulting the plaintiff, formed a holding company and caused the company to purchase the real estate on which the establishment was located. In April, 1999, the plaintiff's involvement in the day-to-day operation of the business ceased. For a few months thereafter, the defendant sent the plaintiff weekly checks in the amount of $750 that included the notation "buyout."

On January 25, 2000, the plaintiff filed a four count complaint, alleging breach of contract, unjust enrichment, breach of implied contract and conversion. As to the breach of contract count, he averred that the parties owned equal shares of Centerfolds, Inc., by vir-

---

[1] The agreement stated that it was between the plaintiff and the defendant, and provided in relevant part: "1. [Centerfolds, Inc.] will be operated for the mutual benefit of both parties. Any surplus profit will be shared equally after a reasonable reserve for operating capital is maintained.

"2. Should either party withdraw from this venture for any reason including death, the venture will continue and may be operated by the survivor. However, the survivor must pay to the withdrawing party, or his representative within 90 days, the value of the withdrawing party's interest in the venture."

[2] The defendant testified that he signed the agreement under duress, but the court found his testimony not credible.

tue of the 1995 partnership agreement, that the agreement provided for the equal division of profits from the parties' joint business venture, and that the defendant had breached the agreement by denying the plaintiff access to the premises and his fair share of the business' profits since May, 1999. The defendant's answer set forth only general denials of the plaintiff's allegations.

A trial to the court was held on October 22 and 30, 2003. The defendant in his posttrial brief argued, inter alia, that the agreement between the parties was illegal and unenforceable insofar as its purpose was to circumvent the state liquor control statutes.[3] The court declined to consider the defendant's argument, noting in its written conclusions of law that illegality is a special defense that, pursuant to Practice Book § 10-50, must be specially pleaded, and that the defendant had not done so. It thereafter concluded that the 1995 partnership agreement constituted a valid contract between the parties and, according to its terms, the plaintiff was entitled to 50 percent of the value of the ongoing business, which value the court found to be $300,000. Accordingly, the court rendered judgment in favor of the plaintiff in part in the amount of $138,000.[4] This appeal followed.

On appeal, the defendant argues that the court improperly enforced the 1995 partnership agreement because it was an illegal contract. According to the defendant, the matter raises a question of the court's

---

[3] The plaintiff did not file a reply brief objecting to the illegality argument raised in the defendant's posttrial brief. He did file, however, a motion in limine prior to trial in which he sought to preclude the defendant from introducing evidence in support of any special defense listed in Practice Book § 10-50. It does not appear that the court ever ruled directly on the motion in limine.

[4] As to the other three counts of the complaint, the court rendered judgment in favor of the defendant.

subject matter jurisdiction and, therefore, his failure to specially plead illegality did not amount to a waiver of the court's consideration of that issue. In response, the plaintiff claims that the court correctly found that the defendant had waived the defense by failing to specially plead it. According to the plaintiff, the court, "[c]onsistent with well established legal principles . . . was required to disregard the defendant's illegality argument and, thus, there is no error." He further contests the defendant's claim that the matter implicated the court's subject matter jurisdiction.

I

As an initial matter, we must determine whether the court properly decided that the defendant's illegality argument could not be addressed because it had not been specially pleaded. After a review of the applicable law, we conclude that the court abused its discretion in declining to consider that claim.[5]

A trial court's decision to decline to review a claim that has not been pleaded specially as required by the rules of practice is reviewable under a deferential standard. See *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 273–74, 819 A.2d 773 (2003). "[W]hen a party properly objects to a violation of the rules of practice, the trial court may disregard the improperly raised claim if doing so is not an abuse of discretion." Id.

Our rules of practice require certain matters to be raised as special defenses, including "illegality not

---

[5] In so concluding, however, we do not agree with the defendant's rationale that the court lacked jurisdiction to enforce the agreement because it was illegal. In his brief, the defendant does not cite any authority for the proposition that illegality of a contract creates a jurisdictional issue, and our research has not uncovered any such authority. Rather, in order to make a determination as to whether a particular agreement is illegal or against public policy, a court necessarily must first exercise jurisdiction over the dispute involving that agreement.

apparent on the face of the pleadings . . . ." Practice Book § 10-50. "The purpose of requiring affirmative pleading is to apprise the court and the opposing party of the issues to be tried and to prevent concealment of the issues until the trial is underway." (Internal quotation marks omitted.) *Sivilla* v. *Philips Medical Systems of North America, Inc.*, 46 Conn. App. 699, 704, 700 A.2d 1179 (1997), quoting *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 24, 664 A.2d 719 (1995). Nevertheless, when a matter required to be specially pleaded by a party is fully litigated at trial without objection from the opposing party, the latter's objection to the special pleading requirement is deemed to have been waived. See *Sivilla* v. *Philips Medical Systems of North America, Inc.*, supra, 704–705.

Relying on that principle, our Supreme Court has refused to find improper a trial court's consideration of an unpleaded special defense that was first argued by the defendant in its posttrial brief when the evidence relied on in support of that defense was introduced at trial by *the plaintiff* in support of *its* claim. See *Web Press Services Corp.* v. *New London Motors, Inc.*, 203 Conn. 342, 349, 525 A.2d 57, following remand, 205 Conn. 479, 533 A.2d 1211 (1987). The court noted that in introducing the evidence, the plaintiff did not request any limitation on its use, and the defendant did not object to its introduction. Id. Essentially, by introducing the evidence itself, the plaintiff effectively waived any objection to the defendant's reliance on it in support of a special defense. See id.; see also *Sidney* v. *DeVries*, 18 Conn. App. 581, 587, 559 A.2d 1145 (1989) (holding that defendant waived objection to plaintiff's failure to plead special defense to counterclaim when evidence plaintiff relied on "was not objected to by the defendant and was, in part, introduced by the defendant"), aff'd, 215 Conn. 350, 575 A.2d 228 (1990); *Nygren* v. *Potocek,*

14 Conn. Sup. 405, 407 (1946) (finding assignment agreement illegal, although illegality not pleaded by defendant, when plaintiff needed to establish agreement's validity in order to recover), aff'd, 133 Conn. 649, 54 A.2d 258 (1947). In short, as the United States District Court for the District of Connecticut has explained in applying an analogous federal rule of pleading, "[f]ailure to plead matter which constitutes an affirmative defense does not . . . preclude a party from taking advantage of the opposing party's proof, if such proof establishes the defense." (Internal quotation marks omitted.) *Lomartira* v. *American Automobile Ins. Co.*, 245 F. Sup. 124, 129 (D. Conn. 1965), aff'd, 371 F.2d 550 (2d Cir. 1967), quoting 2 J. Moore, Federal Practice (2d Ed. 1964) ¶ 8.27 [3], p. 1853.

Those holdings are applicable here. At trial, it was the plaintiff, not the defendant, who first introduced evidence pertaining to the need for a separate partnership agreement and to explain why the plaintiff, an alleged coowner, was not named on any of the documents associated with the business. For example, the plaintiff called his former attorney, David P. Mester, as a witness. On direct examination, Mester testified as to the reason the plaintiff wanted a partnership agreement with the defendant, repeatedly indicating that the plaintiff could not be connected to the liquor permit due to his criminal record.[6] The plaintiff also called Thomas

---

[6] Mester read from his notes of a conversation with the plaintiff that stated in relevant part: "Mario P. can get the license. No record. Andy P. can't get on the liquor license. Can put it under Carol's name, AP's wife, and MP. But what happens if either MP or Carol tells us to fuck off? . . . needs partnership agreement with Mario P. wants liquor license . . . ." Mester then testified that "[i]t was going to be necessary at some point for a liquor license to be obtained. [The defendant] was going to be able to get a license, that is a liquor license, and become the permittee. [The plaintiff] wanted me to draw this partnership establishing a fifty-fifty interest in the partnership."

When asked by the plaintiff's counsel why the plaintiff could not be a permittee under the liquor license, Mester replied, "He had a criminal, felony record." When later asked why the plaintiff would not have been a suitable person on the lease and corporate documents, Mester testified that "[i]t

Cadden, another attorney, who assisted the parties in incorporating Centerfolds, Inc., and in negotiating the lease. On direct examination, Cadden explained that the plaintiff was not involved in the corporation or named on the lease "[b]ecause of his felony conviction."[7] Moreover, the plaintiff, himself, in response to his counsel's query, confirmed that prior to 1993, he had a criminal record of such a nature as would make him an unsuitable permittee or backer. He testified further on direct examination that his involvement with the defendant had "something to do with what [the plaintiff] felt was going to be [his] difficulty in getting a liquor license." Finally, when cross-examining the defendant, the plaintiff's counsel sought and received confirmation that the reason that the plaintiff was not named on the lease or corporate documentation was to avoid a problem with the liquor control commission.

The defendant argued in his posttrial brief, in essence, that the partnership agreement was illegal and unenforceable due to its purpose of allowing the plaintiff to claim a share in the profits of the enterprise while keeping his identity as an owner-backer concealed so that the establishment could obtain a liquor permit. As previously discussed, the evidence tending to support that argument was introduced largely by the plaintiff in the advancement of his claims. Pursuant to the aforementioned case law, under those circumstances, the plaintiff could not then object to the defendant's arguing the defense of illegality without having pleaded it spe-

---

would be for the same reason. He had a criminal, felony record and that would prevent his—that would taint his application or even [the defendant's] application with the liquor license in order for somebody to be permittee for Centerfolds, Inc."

[7] According to Cadden, "[t]he whole purpose of entering into this discussion was to open up a place that served liquor, and I knew that it would be difficult. [The plaintiff] was not very happy about it, but I knew it would be difficult, if not impossible, to get a liquor license if we had to list him as a backer or partner."

cially. By introducing the supporting evidence himself, the plaintiff had, in effect, waived any objection to its use by the defendant.

The nature of the claim at issue provides an independent basis for our conclusion that the question of illegality was properly before the court. "[I]t is generally true that illegality [of a contract], if of a serious nature, need not be pleaded, as a court will generally of its own motion take notice of anything contrary to public policy if it appears from the pleadings *or in evidence,* and the plaintiff will be denied relief, for to hold otherwise would be to enforce inappropriately an illegal agreement . . . ." (Emphasis added.) 6 S. Williston, Contracts (4th Ed. Lord 1995) § 12:5, pp. 56–64; see also 17A Am. Jur. 2d 309, Contracts § 323 (2004) ("if a question of illegality develops during the course of the trial, a court must consider that question, whether pleaded or not"); 2 Restatement (Second), Contracts, c. 8, topic 1, introductory note, p. 5 (1981) ("The rules of substantive law [governing unenforceability of contracts due to their contravention of public policy] do not turn on niceties of pleading or of proof. . . . Even if neither party's pleading or proof reveals the contravention, the court may ordinarily inquire into it and decide the case on the basis of it if it finds it just to do so . . . .").

Our Supreme Court has embraced that notion and rejected a claim that a defendant's failure to plead illegality precluded that defense from being raised in a case involving a contract by which an attorney representing a wife in divorce proceedings would receive as compensation for his services a portion of any alimony she ultimately was awarded. The court found the arrangement to be contrary to public policy. *McCarthy* v. *Santangelo,* 137 Conn. 410, 414, 78 A.2d 240 (1951). According to the court, the "claim that illegality was not pleaded is, under the circumstances, without merit.

A matter affecting public policy should not be decided on a question of pleading." Id.

We conclude that under the circumstances, the issue of the 1995 partnership agreement's illegality was not barred from consideration by the defendant's failure to plead it specially and, therefore, the court should have decided that issue. Its failure to do so was an abuse of discretion.

II

We next consider the defendant's claim that the 1995 partnership agreement was illegal and hence unenforceable. We conclude that the agreement's purpose was to violate the liquor control laws, and that it is contrary to public policy. Accordingly, the court's enforcement of its terms was improper.

In considering that claim, we must defer to the court's findings of fact unless they are clearly erroneous. *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 432, 849 A.2d 382 (2004). We also are mindful, however, that "[w]hether a contract is enforceable or illegal is a question of law for the court, to be determined from all the facts and circumstances of each case. Similarly . . . the question whether a contract is against public policy is [a] question of law dependent on the circumstances of the particular case, over which an appellate court has unlimited review." 17A Am. Jur. 2d 312, supra, § 327. Because our review of a trial court's determination as to the illegality of a contract is plenary, it is of no consequence that the court here did not consider whether the 1995 partnership agreement was illegal. See *Kaiser Steel Corp.* v. *Mullins*, 455 U.S. 72, 76–77, 102 S. Ct. 851, 70 L. Ed. 2d 833 (1982) (deciding illegality of contract issue that had been argued but not adjudicated by federal District Court or federal Circuit Court of Appeals); cf. 6 S. Williston, supra, § 12:5, p. 70 ("appellate courts will refuse to sanction bargains

seriously inimical to public policy although the question of their illegality has not been raised in the lower court"). That is particularly so because the underlying facts as found by the court are adequate to support our determination.

It is well recognized that "no court will lend its assistance in any way toward carrying out the terms of a contract, the inherent purpose of which is to violate the law." (Internal quotation marks omitted.) *12 Havemeyer Place Co., LLC* v. *Gordon,* 76 Conn. App. 377, 385, 820 A.2d 299, cert. denied, 264 Conn. 919, 828 A.2d 618 (2003). "In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged right directly springing from such contract . . . ." (Internal quotation marks omitted.) *Robertson* v. *Stonington,* 253 Conn. 255, 260, 750 A.2d 460 (2000); *Solomon* v. *Gilmore,* 248 Conn. 769, 785, 731 A.2d 280 (1999). "Generally, agreements contrary to public policy, that is those that negate laws enacted for the common good, are illegal and therefore unenforceable. Contractual rights arising from agreements are subject to the fair exercise of the power of the state to secure health, safety, comfort or the general welfare of the community." *12 Havemeyer Place Co., LLC* v. *Gordon,* supra, 389.

Agreements that are legal on their face, yet which are designed to evade statutory requirements, are routinely held unenforceable. For example, in *Homami* v. *Iranzadi,* 211 Cal. App. 3d 1104, 260 Cal. Rptr. 6 (1989), the trial court refused to hold the defendant liable for the principal amount due to the plaintiff under an interest free promissory note. Id., 1111–13. In proving the amount due, the plaintiff testified that the parties had agreed orally on an interest rate of 12 percent and that the reason the loan documents did not reflect any interest was so that the plaintiff could avoid reporting

interest income to the Internal Revenue Service. Id., 1108. Similarly, in *Flynn Bros. Inc.* v. *First Medical Associates*, 715 S.W.2d 782 (Tex. App. 1986), the Texas appeals court held unenforceable a management agreement pursuant to which the plaintiff management corporation was to receive 66.67 percent of the profits of the defendant medical corporation. Id., 785. The court found the agreement illegal because its purpose was to allow the principals of the plaintiff corporation indirectly to practice medicine without a license in violation of state statutes. Id.

This court recently has had occasion to consider, in a context similar to the present one, a claim that an agreement was unenforceable due to illegality although, due to a choice of law provision in the agreement, the matter was governed by Massachusetts substantive law. *Zenon* v. *R. E. Yeagher Management Corp.*, 57 Conn. App. 316, 748 A.2d 900 (2000). In that case, the plaintiff leased premises to the defendant corporation, which premises the latter wanted to operate as a pub. Id., 318. The parties intended that another defendant, Robert Yeagher (Yeagher), would purchase the plaintiff's liquor permit, pursuant to a separate agreement, for purposes of operating the pub. Id., 319.

After the Massachusetts liquor control authorities disapproved transfer of the permit to Yeagher for reasons of financial unsuitability, the parties devised a scheme whereby Yeagher would operate his pub under the plaintiff's liquor permit. Id., 320. Specifically, "[t]he plaintiff pretended that it was he who owned the pub instead of [the defendant] corporation, and Yeagher pretended that he was merely a manager rather than the principal shareholder of the corporation that owned the business." (Internal quotation marks omitted.) Id. "To carry this plan forward, the plaintiff had Yeagher execute a promissory note, payable to the plaintiff, in the amount of $16,280. Yeagher testified that he signed

the note because he wanted to operate the pub; the plaintiff said that he needed the note because he was having trouble with his bank and that it was agreed that the amounts paid on the note would come from the sales of the restaurant." Id.

Thereafter, Yeagher failed to make payments due on the promissory note, and the plaintiff brought an action in which he sought, among other things, to collect the balance due on the note. Id., 320–21. The trial court concluded that the note was unenforceable, as it was an agreement "made to facilitate, foster, or support patently illegal activity." Id., 328. Specifically, it found that the note "served to undermine the Massachusetts liquor licensing system and permit prohibited conduct to occur. Both parties willingly and knowingly engaged in this subterfuge in order to achieve their own goals despite the strong public policy concerning control over who may sell alcoholic refreshments. . . . The promissory note was integral to implement the unlawful operation of the pub because the plaintiff demanded its creation as part of the transaction." (Internal quotation marks omitted.) Id., 329.

"[T]he court concluded that the liquor licensing requirements are for the protection of the public and common good"; id., 330; and that "the parties by their arrangement effectively substituted their own judgment for that of the local licensing authority. To permit the plaintiff to recover under its illegal arrangement would reward it for its illegal conduct and would contravene public policy by elevating the plaintiff's private interests over those of the public." (Internal quotation marks omitted.) Id., 330–31. We agreed with the court's conclusions and, accordingly, affirmed its judgment. Id., 331–32.

Applying Connecticut law and public policy, we conclude that the same result is warranted in the present

matter. "A public policy against the enforcement of promises or other terms may be derived by the court from (a) legislation relevant to such a policy . . . ." 2 Restatement (Second), supra, § 179. Connecticut, like Massachusetts, has a strong public policy concerning control over who may sell alcoholic beverages, as reflected in our liquor control statutes. See *Nelesco Navigation Co.* v. *Dept. of Liquor Control*, 226 Conn. 418, 422, 627 A.2d 939 (1993) ("Because of the danger to the public health and welfare inherent in liquor traffic, the police power to regulate and control it runs broad and deep, much more so than the power to curb and direct ordinary business activity. . . . The Liquor Control Act . . . was adopted in the light of these well-recognized principles." [Internal quotation marks omitted.]); see also *Rivera* v. *Liquor Control Commission*, 53 Conn. App. 165, 170, 728 A.2d 1153 (1999).

Pursuant to those statutes, a person desiring a liquor permit must make a sworn application to the department of consumer protection, providing, inter alia, the names of the applicant and any backer, and indicating "any crimes of which the applicant or his backer may have been convicted. . . ." General Statutes § 30-39 (b) (1). The department of consumer protection, in its discretion, may refuse a permit to an applicant who has been convicted of a felony or who has a criminal record that the department of consumer protection reasonably believes makes him an unsuitable permittee. General Statutes § 30-47 (5). The same reasons for disqualification also are applicable to any backer. General Statutes § 30-47. Absent the requisite permit, it is illegal to sell liquor from a bar or other establishment where it is kept for sale. General Statutes § 30-74.

Here, the 1995 partnership agreement, like the promissory note in *Homami*, was not offensive on its face, but had an illegal, ulterior purpose, namely, to evade the strictures of the liquor control laws. Like the parties

in *Zenon*, the plaintiff and the defendant willingly and knowingly engaged in this subterfuge to achieve their own goals notwithstanding a strong public policy concerning control over who may sell alcoholic refreshments. See *Zenon v. R. E. Yeagher Management Corp.*, supra, 57 Conn. App. 329. Through their agreement, the parties in this case, as did the parties in *Flynn Bros., Inc.*, arranged for the plaintiff effectively to act as an owner-backer of Centerfolds, Inc., without disclosing his involvement, and his felony record, to the department of consumer protection as required by § 30-39 (b) (1). In so doing, they substituted their judgment for that of the department of consumer protection under § 30-47 (5) as to whether the plaintiff, a convicted felon, was a suitable permittee for the purveyance of alcoholic beverages. Because the 1995 partnership agreement was "made to facilitate, foster, or support patently illegal activity"; (internal quotation marks omitted) *Zenon v. R. E. Yeagher Management Corp.*, supra, 328; we conclude that it is illegal as against public policy and, consequently, that the court's enforcement of it was improper.

Although the end result of holding the 1995 partnership agreement illegal may be to allow the defendant to receive a windfall at the plaintiff's expense, our Supreme Court has stated "that this result is common, and . . . necessary in many cases in which contracts are deemed unenforceable on the grounds of furthering overriding public policies." *Solomon v. Gilmore*, supra, 248 Conn. 793. "[I]t is in order to effectuate an underlying public policy, rather than to sanction a party seeking to enforce an 'illegal' contract, that courts refuse to lend assistance to those who have contributed to the illegality that taints the contract." *Dowling v. Slotnick*, 244 Conn. 781, 808, 712 A.2d 396, cert. denied sub. nom. *Slotnick v. Considine*, 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998). Thus, in the case of a contract

whose inherent purpose is to violate the law, "if both parties [thereto] are in pari delicto, the law will leave them where it finds them." (Internal quotation marks omitted.) Id., 807. "Knowing that they will receive no help from the courts and must trust completely to each other's good faith, the parties are less likely to enter an illegal arrangement in the first place." (Internal quotation marks omitted.) *Homami* v. *Iranzadi*, supra, 211 Cal. App. 3d 1113.

The judgment is reversed only as to the first count of the complaint and the case is remanded with direction to render judgment in favor of the defendant on that count. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.