******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE SANTIAGO G.*
(SC 19449)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued May 19—officially released August 21, 2015***

*Elizabeth Knight Adams*, with whom was *Matthew Eagan*, for the appellant (respondent mother).

*Michael Besso*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Gregory T. D'Auria*, solicitor general, for the appellee (petitioner).

*Joshua Michtom*, assistant public defender, for the minor child.

*Opinion*

ROGERS, C. J. This case presents a stark illustration of how a person's conscious decision to disregard the law, probably motivated by the best of intentions, nevertheless can lead to unfortunate, unintended consequences. The respondent biological mother, Melissa M. (respondent), appeals from the judgment of the Appellate Court affirming the trial court's order denying her motion to revoke the commitment of her son, Santiago G., to the petitioner, the Commissioner of Children and Families (commissioner), and to transfer his custody to a nonrelative third party, Maria G., who had acted as Santiago's psychological parent for the first three and one-half years of his life (motion to revoke). *In re Santiago G.*, 154 Conn. App. 835, 108 A.3d 1184 (2015). The respondent claims that the Appellate Court's judgment should be reversed because the trial court improperly denied her motion to revoke, as well the commissioner's motion to open and set aside an earlier adjudication of neglect (motion to open), because the basis for removing Santiago from Maria G.'s care and adjudicating him neglected never actually existed, but rather, was a mistake. We disagree and, accordingly, affirm the judgment of the Appellate Court.

I

FACTUAL BACKGROUND AND PRETRIAL PROCEEDINGS

The following facts and procedural history are relevant to this appeal. Santiago was born in Guatemala to the respondent on April 18, 2009. He was cared for since his birth, however, by Maria G., an Argentinian citizen and legal permanent resident of the United States who resided in Stamford, and, for some of that time, by Henry L., Maria G.'s husband.[1]

On October 16, 2012, the commissioner filed a motion for an order of temporary custody of Santiago on the basis of neglect. An accompanying summary of facts substantiating the commissioner's allegations of neglect, which was supported by the affidavits of two social workers for the Department of Children and Families (department), Martha Saavedra and Ingrid Aarons, stated the following: On September 17, 2012, the department had received a report from the federal Department of Homeland Security (Homeland Security)[2] stating that Maria G. and Henry L. possibly had purchased Santiago in Guatemala and smuggled him into the United States on June 14, 2009.[3] On October 10, 2012, Saavedra and a Homeland Security investigator had conducted a joint visit to Maria G.'s home to question her about the allegations in the report. Maria G. told the two that her former housekeeper's mother had introduced her to an individual, later identified as the respondent, in Guatemala. According to Maria G., the respondent was a teenager at the time and an orphan. Maria G. also stated that the

respondent was pregnant and interested in giving away her baby. Maria G. indicated further that the respondent did not have proper identification, and that she could not remember the respondent's name. According to Saavedra's supplemental affidavit, Maria G. further told her and the Homeland Security investigator that Maria G. and Henry L. had paid an unnamed physician, at an unknown clinic in Guatemala, to deliver the baby; that they had a midwife falsely state that the baby was Maria G.'s in order to obtain a birth certificate naming Maria G. and Henry L. as the baby's parents; and that they had paid another party $6000 for a falsified United States passport for the baby to permit his entry into the United States. Upon receiving the foregoing information, the department had invoked a ninety-six hour hold over Santiago, and he was placed in a licensed foster home. The department represented to the court that the whereabouts of Henry L. were unknown, despite the department's efforts to contact him, and that Santiago had "no known legal guardian or legal custodian."

Aarons' supplemental affidavit provided additional reasons in support of the motion for an order of temporary custody. In that affidavit, Aarons attested that, after the ninety-six hour hold had expired, Santiago had been returned to Maria G. because two other trial courts, *Mottolesse*, *J.*, and *White*, *J.*, had denied the commissioner's two previous requests for orders of temporary custody, one judge reasoning that Santiago's " 'illegal status' " did not constitute evidence of immediate physical danger. Aarons further attested to the following:

"Although it remains unclear how [Maria G.] obtained physical custody of this child, Homeland Security has an active investigation into the allegations of child trafficking. Santiago's safety and [well-being] is now completely reliant on [Maria G.] and her statement that she will keep the child safe and not take the child out of this jurisdiction. . . .

"[The department] has no independent information as to the identity of the biological parents of the child or the circumstances which surrounded [Maria G.] having obtained physical custody except by [Maria G.'s] own uncorroborated statement. . . .

"Upon information and belief, [Maria G.] is in the United States with a [g]reen [c]ard. Her actions in connection with smuggling the child into the United States may result in her being deported to Argentina and/or subject to other criminal sanctions. . . .

"Because of the pending Homeland Security investigation, the [department's] current involvement, and the denial of the two [previous] [m]otions for [o]rder of [t]emporary [c]ustody, the risk to the child has increased. In particular, the risk of [Maria G.'s] flight with the child, despite her assurances otherwise. The child's safety should not be based on the assurances

of an individual who admittedly brought the child into this country under fraudulent circumstances. . . .

"The child's medical care and daycare decisions have all been made by [Maria G.] without her having any legal right to make these decisions. This again places the child in danger [without] any legal guardian available to make these decisions. Because of [Maria G.'s] lack of status in this action the [c]ourt's jurisdiction to make orders against her for the protection of the child is tenuous at best. . . .

"The [department] is seeking access to this child to ensure his safety and [well-being]. Still, only a [full-time] legal guardian and/or custodian, with [twenty-four] hour control and access can ensure that the child is not removed from the jurisdiction or that medical or other emergencies can be appropriately addressed. . . .

"Henry [L.] . . . is alleged to have acted in concert with [Maria G.] in [the] acquisition and transport of this child into the United States. Although the [department] has been given a telephone number for [Henry L.] by [Maria G.], [Henry L.] has not returned [the department's] calls. Although [Maria G.] has agreed to remain in contact with [the department], there is no guarantee that she will follow through with her word. . . .

"[Maria G.] has not disclosed to the [department] pertinent information [such as] the biological mother's or father's names, the midwife's name, the doctor or the clinic where the delivery occurred. [Maria G.] also has failed to disclose the identity of the person who provided the passport for the child. Nor has she provided the [department] with the passport or a copy thereof, as she stated it was destroyed. However, [Maria G.] has reported that she paid someone for the delivery of the child and for the fraudulent passport. . . .

"By her statements and her actions, [Maria G.] is not being completely candid and cooperative with the [department] in this investigation. The safety and [well-being] of this child should not be entrusted to a person who has disclosed involvement in potential criminal conduct. . . .

"To leave the child with [Maria G.] would keep the child in a zone of immediate physical danger. . . .

"[The attorney for the minor child] is in agreement with the [o]rder of [t]emporary [c]ustody."

On October 16, 2012, on the basis of the foregoing allegations, the trial court, *Heller*, *J.*, granted the commissioner's motion for an order of temporary custody. The order was sustained following a hearing on October 25, 2012, with the agreement of the attorney for Santiago, because neither of Santiago's biological parents had been identified by that time.[4] On November 15, 2012, the trial court, *Heller*, *J.*, adjudicated Santiago

neglected, on the basis of abandonment by his biological parents, who still remained unknown, and ordered him committed to the commissioner's custody. After removing Santiago to a temporary foster home in November, 2012, the department placed him in a legal risk preadoptive foster home in December, 2012, where he remains today. At the time of this placement, the department's permanency plan for Santiago was termination of his biological parents' rights and adoption by the foster parents.

On December 6, 2012, counsel for the department informed the trial court that Maria G. had provided him with the respondent's identity and that the department was in the process of verifying that the respondent was in fact Santiago's biological mother.[5] Counsel also informed the court that Maria G. was facing federal prosecution for immigration fraud and possible deportation and/or incarceration. On February 28, 2013, the respondent filed an appearance through counsel[6] and began participating in the case. She did not appeal from the October 16, 2012 order of temporary custody or the November 12, 2012 adjudication of neglect, at that time or any time thereafter. DNA testing results subsequently confirmed that the respondent was Santiago's biological mother and, on June 6, 2013, the trial court entered an order adjudicating her to be the same.[7]

Initially, following Santiago's removal and foster home placement, Maria G. was permitted to visit him weekly. After January 20, 2013, however, the visits were discontinued unilaterally by the department.[8] Following the establishment of the respondent's maternity, the department sought to reinstate visitation, and it changed its permanency plan to termination of the respondent's parental rights and placement of Santiago with Maria G. The commissioner also reversed her earlier opposition to Maria G. intervening in the case. See footnote 4 of this opinion.

On June 5, 2013, however, the attorney for Santiago filed emergency motions requesting that Santiago receive a psychological evaluation, to appoint him a guardian ad litem and to delay reunification visits with Maria G. The attorney represented that Santiago had "expressed a strong desire not to visit with Maria G. and not to be returned to her care," and further quoted from a May, 2013 department status report reflecting a physician's recommendation that Santiago's foster placement remain in place until the "legal situation" was clarified, because he had established a secure and stable connection with his foster family and would be affected adversely by further disruptions. The trial court, *Heller, J.*, granted all of these motions and, aside from an August, 2013 interactional evaluation, there was no further contact between Maria G. and Santiago for the remainder of the proceedings.

The trial court appointed Rodolfo J. Rosado, a psy-

chologist, to conduct psychological and interactional evaluations of Santiago and Maria G., which were completed on or about August 6, 2013. Rosado reported a strong bond between Maria G. and Santiago. He recommended that visitation recommence, and that Santiago ultimately be returned to Maria G. On October 16, 2013, the department filed a motion for visitation. The attorney for Santiago continued to oppose visitation.

On October 22, 2013, the respondent filed her motion to revoke Santiago's commitment, requesting that he be removed from the commissioner's custody and transferred to Maria G.'s custody and guardianship. Therein, the respondent cited the trial court's finding that she was Santiago's biological parent, and her consistently held desire that Maria G. be Santiago's adoptive mother. She further cited Rosado's report of a remaining bond between the two, his recommendation that they be reunited, and the fact that there were no substantiated reports of Maria G. physically abusing or neglecting Santiago while he was in her care.

On December 20, 2013, the commissioner filed the motion to open, requesting that the November 15, 2012 judgment that had adjudicated Santiago neglected be set aside. According to the commissioner, that judgment was "based on the mutual mistake of the parties that the identity of [Santiago's] biological parents was unknown at the time of the commitment and that [Santiago] had been a victim of human trafficking." Also in December, 2013, the trial court ordered David Mantell, a licensed clinical psychologist, to perform psychological and interactional evaluations of Santiago and his foster family. Mantell recommended, contrary to Rosado's recommendation, that Santiago remain with the foster family because, in short, yet another disruption in his life would be too traumatic.

II

TRIAL COURT PROCEEDINGS

A

The Trial

A trial on the motion to open the judgment filed by the commissioner and the motion to revoke Santiago's commitment filed by the respondent was held on multiple days between January 16 and April 22, 2014. Several witnesses testified, including Saavedra and Maria Brereton, a regional administrator for the department, Maria G., Rosado, Mantell and Brian Kaschel, the guardian ad litem appointed for Santiago. During the course of the trial, the trial court learned that Maria G. had pleaded guilty to a federal felony in connection with her bringing Santiago into the country illegally with forged documents, and that she soon would be deported to Argentina as part of her sentence.[9]

Saavedra and Brereton testified about the initial

removal of Santiago from Maria G.'s home, following the department's receipt of the report from Homeland Security, and the contemporaneous filing of a neglect petition. Both women testified that Maria G. initially claimed that she was Santiago's biological mother, but after further questioning, changed her story to the one recounted in the previously described affidavits. Saavedra testified that Maria G.'s story could not be verified, nor could the allegations of human trafficking be disproven, because the department had no information regarding the identity of Santiago's biological parents. Brereton explained similarly that the respondent's identity was not confirmed until June, 2013, and that the initial removal was sought because the department had information that Santiago "had entered the country illegally, did not have a guardian [and] was a possible victim of human trafficking . . . ." According to Brereton, the "primary issue" was neglect due to the lack of a guardian, but there also was concern about "the human trafficking question." There were no indications of physical abuse. Brereton explained that eventually, once the respondent's maternity and intentions were confirmed, department officials believed that a mistake had been made and began attempts to return Santiago to Maria G.

Maria G. relayed the story of how she and Henry L. acquired custody of Santiago upon his birth in Guatemala, which was consistent with that recounted in the previously described affidavits. She testified, inter alia, that prior to Santiago's birth, she and Henry L. had consulted two attorneys in Guatemala, who told them that they could not adopt the baby because all adoptions in the country "were closed" at the time and because the respondent, who then was a fourteen year old orphan, lacked personal documentation. Maria G. explained that she and Henry L. then paid for the baby to be delivered in a clinic, because if he had been born in a hospital, he would have been turned over to an orphanage. Maria G. insisted that they did not pay anything to the respondent and encouraged her, or her older sister, to keep the baby, but that the respondent was desperate, destitute and adamant that they take him. She recounted how they subsequently obtained a false document from a midwife indicating that she had given birth to Santiago and used it to obtain a birth certificate and a Guatemalan passport for Santiago, but then discovered that those documents would not enable them to return to the United States with Santiago unless she could provide evidence of his prenatal history. Thereafter, Maria G. indicated, Henry L. returned to the United States, and she was introduced to a man in Guatemala who sold her a forged American passport for Santiago. Ultimately, Maria G. also returned to the United States, using that fraudulent passport to bring Santiago with her. Maria G. and Henry L. then consulted two more attorneys, who advised them that Santiago's illegal sta-

tus could not be remedied and that they could not legally adopt him, at least in part because of the existence of the falsified birth certificate. The three thereafter resided in Connecticut without legal trouble until the commencement of the events underlying this appeal.

Rosado and Mantell testified consistently with the opinions they had expressed in their earlier written reports. In short, both agreed that Santiago had experienced much trauma due to the disruptions in his life that already had occurred, namely, the unexplained departure of Henry L.; see footnote 1 of this opinion; his removal from Maria G.'s home, and his initial placement in a different foster home prior to his placement with his current foster family. They also agreed that Santiago likely would have psychological issues in the future due to these occurrences. The experts disagreed, however, as to what course of action would lead to the least future trauma, with Rosado recommending that Santiago be returned, after a transition period, to Maria G., and Mantell opining that Santiago would be better off remaining with his current foster family. Kaschel testified as to his opinion that, although Maria G. was a suitable and worthy guardian, it would not be in Santiago's best interests to be placed with her. Kaschel also was concerned with, among other things, the implications of Maria G.'s impending deportation to Argentina.

On April 22, 2014, the trial court, *Mottolese, J.*, denied the commissioner's motion to open the judgment and the respondent's motion to revoke Santiago's commitment, and disapproved the department's permanency plan of placing Santiago with Maria G. Regarding the motion to revoke, the court first found that the grounds for Santiago's commitment no longer existed. It thereafter concluded that revocation of the commitment was not in Santiago's best interests, essentially agreeing with Mantell that the trauma that would result from disrupting his placement yet again and returning him to Maria G. would be greater than that which he potentially might suffer in the future were the status quo left in place, given what already had occurred. The court found that any attachment Santiago still had to Maria G. would diminish and that he was thriving with his foster family and would continue to do so. In sum, the trial court concluded, it would be in Santiago's best interest to remain with his foster family, and contrary to his best interest to be returned to Maria G.[10]

B

Posttrial Motions

On April 28, 2014, the commissioner filed a motion for reconsideration of the trial court's decision, arguing that delay in the trial and the failure to afford Maria G. visitation with Santiago in the interim had impacted adversely her chances at gaining custody. The commissioner argued further that the court improperly had

failed to grant her December 20, 2013 motion to open based on the mutual mistake of the parties, specifically, the parties' belief that the identities of Santiago's biological parents were unknown and could not be ascertained, and that Santiago had been a victim of human trafficking. She noted that, subsequent to the order of temporary custody and the neglect adjudication, the department was able to verify the respondent's identity and confirm her desire that Maria G. have custody of Santiago. According to the commissioner, the respondent's wishes as to who should have custody of her son should have "weighed heavily" in the earlier proceedings, but were not due to the mutual mistake. The commissioner implored the court to "act now to correct [the order of temporary custody and neglect adjudication] because those judgments were based on mistaken facts."

Judge Mottolese granted the commissioner's motion for reconsideration, but denied the relief requested therein. He questioned whether there had been any mutual mistake and concluded, in any event, that the best interests of Santiago were paramount. Judge Mottolese explained that initially, he had disagreed strongly with Santiago's removal from Maria G.'s home, particularly because two other trial judges had denied the commissioner's requests for an order of temporary custody, but that "the facts [that] came out in the trial certainly prevailed over [his] initial emotional reaction to the case." The respondent's appeal to the Appellate Court followed.

### III

### APPELLATE COURT PROCEEDINGS

In the Appellate Court, the respondent claimed, inter alia, that the trial court improperly had considered Santiago's best interests, pursuant to General Statutes § 46b-129 (m),[11] because the original cause for his commitment to the commissioner had never existed.[12] *In re Santiago G.*, supra, 154 Conn. App. 845–46. The Appellate Court, relying on its recent opinion in *In re Avirex R.*, 151 Conn. App. 820, 96 A.3d 662 (2014), concluded that the trial court improperly had decided the respondent's motion to revoke Santiago's commitment by applying § 46b-129 (m) instead of § 46b-129 (j), because the respondent had sought to transfer guardianship of Santiago to a party who was not his parent or former legal guardian, making the latter subsection the applicable one. *In re Santiago G.*, supra, 846–50. The Appellate Court determined, however, that the trial court properly had considered Santiago's best interests, because that was what application of § 46b-129 (j) would have required. Id., 851. In short, the Appellate Court held, the trial court had committed harmless error. Id.

We thereafter granted the respondent's petition for

certification to appeal,[13] limited to the following questions: (1) "Did the Appellate Court properly affirm the judgment of the trial court denying the [respondent's] motion to revoke commitment [when] both the respondent . . . and the [department] agree[d] that the initial basis for the state's removal of the child from his home was found never to have existed?" and (2) "Did the Appellate Court properly affirm the trial court's judgment denying the [commissioner's] motion to [open] due to a mistake, in favor of a best interest determination regarding the child's current placement?" *In re Santiago G.*, 315 Conn. 926, 926–27, 109 A.3d 921 (2015).

## IV

### THE PRESENT APPEAL

#### A

#### The Parties' Claims

The respondent claims that the Appellate Court improperly affirmed the judgment of the trial court denying her motion to revoke Santiago's commitment because, regardless of whether the issue is analyzed under subsection (j) or (m) of § 46b-129, the court lacked the authority to deny the motion on the basis of Santiago's best interests when the only factual basis for his removal from Maria G.'s home and commitment to the commissioner's custody later was determined to be mistaken. According to the respondent, both of those subsections necessarily contemplate that a proper cause for removal existed in the first instance, and here, it has been definitively disproven that Santiago was a victim of human trafficking. The respondent contends that Santiago improperly was removed from Maria G.'s custody solely due to concerns about his immigration status, and she emphasizes that there never was any evidence of any victimization, abuse or physical neglect.

The commissioner agrees with the respondent that the factual basis for Santiago's removal was mistaken, because ultimately it was determined that Maria G. had not engaged in human trafficking, and she contends that the trial court improperly failed to afford appropriate significance to this fact by denying the respondent's motion to revoke on the basis of Santiago's best interests. According to the commissioner, the unusual facts and procedural posture of this case made a typical application of the statutory standard improper, and that instead, some other procedure should have been employed to rectify the mistakes that were made and to return Santiago to Maria G.'s custody.

The attorney for Santiago opposes the reversal of the Appellate Court's judgment, and contends that that court properly affirmed the trial court's denial of the respondent's motion to revoke the commitment. According to Santiago's attorney, the respondent's claim amounts to an improper collateral attack on the order of temporary custody and the neglect adjudica-

tion, decisions from which she did not appeal. He emphasizes that Maria G. is not Santiago's biological or legal parent, and therefore lacks any constitutionally protected right to parent him that the trial court should have considered but did not.

We disagree with the factual premise of the respondent's legal argument that § 46b-129 (m) is inapplicable where the initial cause for commitment never existed, because it is clear from the record before us that the bases set forth by the commissioner in support of her motion for an order of temporary custody and the neglect petition did, in fact, exist. We conclude, therefore, that the trial court properly proceeded pursuant to § 46b-129 (m) and engaged in a best interests analysis prior to denying the respondent's motion to revoke.[14]

B

Analysis

We begin with the standard of review. The respondent challenges the meaning and/or applicability of § 46b-129 (m) given the facts of this case, which essentially are not disputed. The meaning of a statute, and the question of whether it applies to a given factual scenario, are matters of statutory interpretation, over which our review is plenary. *Efstathiadis* v. *Holder*, 317 Conn. 482, 486,    A.3d    (2015).

We turn to the relevant governing legal principles. The commissioner may seek and obtain the commitment of a child or youth to her custody by filing "a verified petition plainly stating [inter alia] such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared for or abused within the meaning of section 46b-120 . . . ." General Statutes § 46b-129 (a). If it appears from the specific allegations of the petition and accompanying affidavits "that there is reasonable cause to believe that (1) the child or youth is . . . in immediate physical danger from the child's or youth's surroundings, and (2) as a result of said conditions, the child's or youth's safety is endangered and immediate removal from such surroundings is necessary to ensure the child's or youth's safety, the court shall either (A) [order the child's] parents or other [guardian] to appear [for a determination regarding temporary custody], pending disposition of the petition, or (B) issue an order ex parte vesting the child's or youth's temporary care and custody in [a relative] or in some other person or suitable agency." General Statutes § 46b-129 (b).

"Upon finding and adjudging that any child or youth is uncared for, neglected or abused the court may (A) commit such child or youth to the [commissioner], and such commitment shall remain in effect until further order of the court, except that such commitment may be revoked or parental rights terminated at any time by the court . . . ." General Statutes § 46b-129 (j) (2) (A)

Section 46b-129 (m) provides in relevant part that "[t]he commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, upon finding that cause for commitment no longer exists, and that such revocation is in the best interests of such child or youth, the court may revoke the commitment of such child or youth. . . ." Our rules of practice provide further that "[w]hether to revoke the commitment is a dispositional question, based on the prior adjudication [here, of neglect], and the judicial authority shall determine whether to revoke the commitment upon a fair preponderance of the evidence. The party seeking revocation of commitment has the burden of proof that no cause for commitment exists. If the burden is met, the party opposing the revocation has the burden of proof that revocation would not be in the best interests of the child." Practice Book § 35a-14A; see also *In re Shanaira C.*, 297 Conn. 737, 758–59, 1 A.3d 5 (2010).

Pursuant to § 46b-129 (j) (2), a trial court, "prior to awarding custody of [a] child to the department pursuant to an order of commitment . . . must both *find* and *adjudicate* the child on one of three [statutorily defined] grounds: uncared for, neglected or [abused]." (Emphasis in original.) *In re Alison G.*, 276 Conn. 146, 159, 883 A.2d 1226 (2005). Adjudication on any of these grounds requires factual support, and "[t]he trial court's determination thereafter as to whether to maintain or revoke the commitment is largely premised on that prior adjudication." Id., 160. Accordingly, "[t]he court, in determining whether cause for commitment no longer exists . . . look[s] to the original cause for commitment to see whether the conduct or circumstances that resulted in commitment continue to exist." (Internal quotation marks omitted.) Id.

In the present matter, the trial court, *Heller, J.*, found that there was reasonable cause to believe that Santiago was in immediate physical danger and issued an order of temporary custody in reliance on the affidavits of Saavedra and Aarons. Those affidavits emphasized that the child lacked a legal guardian in the United States, given that the identities of his biological parents were unknown, and also that Maria G. was being investigated by federal authorities for possible child trafficking and was facing deportation and criminal sanctions for smuggling Santiago into the country. Moreover, the affidavits explained, due to the recent intervention of state and federal authorities into her life, Maria G. was aware of these facts, which gave her a strong incentive to flee with Santiago. Subsequently, Judge Heller, presumably relying on the same affidavits, adjudicated Santiago neglected on the basis of abandonment by the respondent. See General Statutes § 46b-120 (6) (A) (defining neglected child as one who, inter alia, "has been abandoned").[15] We disagree with the commissioner and the respondent that the cited factual bases for the court's

rulings were mistaken or that they never existed.

At the outset, we must emphasize that the issue before the trial court was whether Santiago had been abandoned by his biological mother, the respondent in this case, and not by Maria G. In Connecticut, the number of ways to create a legal parent-child relationship is limited and exclusive: by conception or through legal adoption, or pursuant to our statutes governing artificial insemination or valid gestational agreements. *Raftopol* v. *Ramey*, 299 Conn. 681, 690–94, 698, 12 A.3d 783 (2011). An examination of Maria G.'s account of how she and Henry L. had acquired Santiago in Guatemala, as reflected in the social workers' affidavits and ultimately verified to be true, clearly demonstrates that, at the time of Santiago's removal, none of these paths to legal parenthood, for Maria G., had been satisfied. Additionally, although Maria G. was in possession of a birth certificate naming her as Santiago's mother, she ultimately conceded that that birth certificate was fraudulent. As we previously have explained, "[a] birth certificate is a vital record that must accurately reflect legal relationships between parents and children—it does not create those relationships." Id., 698. In sum, it was absolutely correct that Santiago had no legal guardian in the United States, and neither the parties nor the court was mistaken in this regard.

The other facts attested to by department representatives were equally true. At the time of the order of temporary custody and neglect adjudication, the identities of Santiago's biological parents *were* unknown, and the respondent was not identified to the court until approximately three weeks after the neglect adjudication was rendered, did not appear in the case for another three months and was not confirmed to be Santiago's biological mother for another six months. In addition, Maria G. *was* being investigated for child trafficking, as indicated by Homeland Security's report to the department. Finally, she *did* face deportation and criminal sanctions for smuggling Santiago into the country, as amply demonstrated by the fact that she later pleaded guilty to a federal felony and is awaiting deportation to Argentina.

The grounds on which the trial court relied for the adjudication of neglect also existed and were not, as the respondent and the commissioner now insist, mistaken or untrue. For purposes of termination proceedings, "abandonment" has been defined as a parent's "fail[ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . ." General Statutes § 17a-112 (j) (3) (A). "Maintain [as used in the statute] implies a continuing, reasonable degree" of interest, concern, or responsibility and not merely a "sporadic showing" thereof. (Internal quotation marks omitted.) *In re Paul M.*, 148 Conn. App. 654, 664, 85 A.3d 1263, cert. denied, 311 Conn. 938, 88 A.3d

550 (2014). Although the respondent ultimately appeared in the proceedings in February, 2013, and actively advocated for what she perceived to be the most desirable outcome for Santiago, her relinquishment of the child just after his birth to Maria G. and Henry L. in April, 2009, even if motivated by good intentions, undoubtedly constituted abandonment. Importantly, there is no indication in the record that the respondent and Maria G., who had met shortly before Santiago's birth and parted ways approximately two weeks after he was born, had maintained any type of contact or correspondence prior to the events underlying this appeal. Rather, when questioned by investigators, Maria G. was unsure of the respondent's name, and was not able to provide it to the court until almost two months after Santiago's removal from her home. Additionally, the respondent has never sought to regain custody of Santiago, but contends only that he should be returned to Maria G.

Ultimately, a complete investigation, which included locating and contacting the respondent and having her submit to DNA testing, revealed that Maria G.'s account of how Santiago came to be in her care and custody was true. That circumstance, however, does not render false the essential facts that supported the trial court's custodial orders, as recited herein. Although the respondent and the commissioner now attempt to characterize the sole basis of the removal as the department's absolute belief that Santiago had been a product of child trafficking, rather than smuggled into the country following an illegal adoption, that characterization is not borne out by the record. In fact, the commissioner, in seeking an order of temporary custody and adjudication of neglect, relied heavily on allegations related to the lack of a legal guardian in this country who could make essential decisions on behalf of Santiago.

It is entirely understandable that, with the benefit of hindsight and full, accurate and verified information at their disposal, department officials came to regret the manner in which they chose to exercise the discretion with which they are vested in the execution of their agency duties. This is especially so given the unfortunate and unpredictable manner in which the proceedings played out, in particular the delay in the trial and the contemporaneous denial of visitation between Maria G. and Santiago, which initially resulted from the unilateral decision of the department but thereafter was continued at the behest of the attorney for Santiago and allowed by the court. Nevertheless, that the department eventually came to view its initial decisions to pursue removal and custody as unnecessary, and perhaps ill considered, does not render those decisions without a factual basis.

As a final matter, we must reject the suggestion of the parties that the highly unusual facts of this case

warranted a disregard of the typical procedures attendant to a motion to revoke commitment, in favor of some alternative approach more suited to the circumstances. The problem here is not so much that the statutory framework is inadequate, but that it was not designed to accommodate individuals who have chosen to operate outside of the strictures of the law, regardless of their reasons. It was because the respondent and Maria G. knowingly agreed to effectuate an illegal international adoption that Maria G. was vulnerable to the cruel act of a vindictive individual; see footnote 2 of this opinion; and all of the subsequent occurrences that that act set in motion. Because Maria G. lacked the status of a legal parent, she also lacked the constitutional and statutory rights attendant to that status. Additionally, the illegalities involved in Maria G. obtaining Santiago and transporting him, using a fraudulent passport, to the United States resulted in significant delay in the discernment of the truth, during which the interests of Santiago in stability and permanency[16] began to diverge, as it turns out inexorably, from the interests of the respondent and Maria G. We say this not to chastise or lay blame, but rather, to explain that the law is ill equipped to save those who have chosen to disregard it.[17]

The respondent's second claim, that the Appellate Court improperly affirmed the trial court's decision denying the commissioner's motion to open the judgment, also rests on the premise that the earlier adjudication of neglect was based on a factual mistake. Because we disagree with that premise, the second claim necessarily fails.

The judgment is affirmed.

In this opinion the other justices concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** August 21, 2015, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Maria G. testified that she and Henry L. separated in February, 2012. Henry L. ceased visiting Santiago in March, 2012, and did not seek any further contact with the child.

[2] The report of Homeland Security resulted from a tip that that department had received from a family friend and former tenant of Maria G. According to Maria G., the tenant contacted Homeland Security after she refused his sexual advances and directed him to move out of her house.

[3] The report also stated that Maria G. had been observed being physically aggressive with Santiago. This allegation was never substantiated.

[4] Maria G. attempted to participate in the October 25, 2012 hearing by presenting, through her counsel, the falsified Guatemalan birth certificate. When counsel for the department asked her whether she was Santiago's biological mother, her counsel instructed her to invoke the fifth amendment privilege against self-incrimination. On November 20, 2012, Maria G. filed a motion to intervene in the proceedings. A ruling on the motion was deferred so that an intervenor study could be completed, and ultimately, the motion was denied by the trial court. See Practice Book § 35a-4 (c).

[5] Counsel for the department expressed some skepticism about the accuracy of the information provided by Maria G., given that she previously had admitted to obtaining a fraudulent passport and had attempted to appear

as a party in court using the falsified Guatemalan birth certificate. He questioned whether the respondent could be "a conspirator of [Maria G.] or [alternatively] could be the innocent mother whose child was taken." For that reason, the department wanted definitive proof of the respondent's maternity.

[6] Although the respondent has remained in Guatemala throughout the entirety of these proceedings and never has been physically present in court, she repeatedly has communicated with her counsel and the department in written communications and via e-mail.

[7] Although a putative father was identified, his status as Santiago's biological parent has not been definitively established. On January 24, 2013, the trial court rendered a default judgment against him for failing to appear in the proceedings following service by publication.

[8] The record reveals several reasons that visitation was terminated by the department and, thereafter, not resumed. First, at the last visit between Maria G. and Santiago, Maria G. became agitated, yelled and grabbed a social worker, causing Santiago to react negatively. Second, approximately two weeks prior to that visit, the department received a report that Maria G. had pushed a neighbor down a flight of stairs; that neighbor apparently was the daughter of the individual who had reported Maria G. to Homeland Security. See footnote 2 of this opinion. Third, an initial psychiatric evaluation of Santiago had included a recommendation against visitation. Fourth, Maria G. did not have intervenor status. Fifth, Santiago was not asking to see Maria G. Sixth, Santiago was not showing any adverse effects from the lack of visitation and previously had been disruptive in his foster home following visits with Maria G.

[9] On April 22, 2014, the trial court was informed that Maria G. would be sentenced on May 2, 2014.

[10] In considering Santiago's best interests, the trial court also addressed the likely effectiveness of any reunification with Maria G., noting that there were only three to four weeks in which to achieve such reunification before Maria G. was scheduled for possible deportation. In the court's view, an accelerated reunification plan involving immediate visitation was "unrealistic, and counterproductive, and [would] be harmful to the child." Moreover, even assuming that a move to Argentina would go smoothly for Santiago, the court concluded that it was unclear what level of psychological and therapeutic assistance was available for him there.

On May 6, 2014, the commissioner filed a motion to open the April 22, 2014 judgment on the basis of newly discovered evidence, namely, the department's having learned that the respondent's federal sentencing had been continued to August, 2014. The respondent joined in the commissioner's motion to open. On May 27, 2014, the trial court denied the motion to open, explaining that the evidence produced would not change the result of its original ruling, which was based primarily on Santiago's best interest and only secondarily on Maria G.'s deportation status. Although the respondent challenged this ruling in the proceedings before the Appellate Court, it is not part of the present appeal.

[11] General Statutes § 46b-129 (m) provides: "The commissioner, a parent or the child's attorney may file a motion to revoke a commitment, and, *upon finding that cause for commitment no longer exists*, and that such revocation is in the best interests of such child or youth, the court may revoke the commitment of such child or youth. No such motion shall be filed more often than once every six months." (Emphasis added.)

[12] The respondent further contested the trial court's best interests finding as clearly erroneous; *In re Santiago G.*, supra, 154 Conn. App. 851; and contended that the court improperly had denied the motion to open on the basis of newly discovered evidence. Id., 858. The Appellate Court disagreed with each of these claims; id., 857–58, 860; and they are not a part of the present appeal.

[13] The department's cross petition for certification to appeal from the judgment of the Appellate Court was denied. *In re Santiago G.*, 315 Conn. 927, 109 A.3d 922 (2015).

[14] It is well established that a court is not bound by the agreement of the parties as to a matter in issue. See, e.g., *Constantino* v. *Skolnick*, 294 Conn. 719, 730–32, 988 A.2d 257 (2010). Moreover, despite the respondent's assertion otherwise, the attorney for Santiago has not conceded that the basis for Santiago's removal was mistaken. Finally, it is clear that we may affirm the judgment of the Appellate Court on the basis of different reasoning. See *State* v. *Dort*, 315 Conn. 151, 155, 106 A.3d 277 (2015). In this regard, we agree with the respondent that a transfer of Santiago's guardianship pursuant

to § 46b-129 (j) necessarily would have entailed a revocation of his custody to the commissioner pursuant to § 46b-129 (m), thereby rendering inconsequential the distinction drawn by the Appellate Court.

[15] Pursuant to our child protection statutes, neglect on the basis of abandonment is distinct from neglect based on: "deni[al] [of] proper care and attention, physically, educationally, emotionally or morally"; General Statutes § 46b-120 (6) (B); "permitt[ing] [a child or youth] to live under conditions, circumstances or associations injurious to [his or her] well-being"; General Statutes § 46b-120 (6) (C); or abuse. General Statutes § 46b-120 (7). Thus, although we agree with the respondent that there is absolutely no indication that Maria G. was abusing Santiago or denying him physical or emotional care, we disagree that that circumstance foreclosed an adjudication of neglect.

[16] The trial court, *Mottolese, J.*, relying on the testimony of an expert psychiatric evaluator and a guardian ad litum, concluded that it was in five year old Santiago's best interests to remain with the foster family with whom he had bonded strongly after living in their home as a son and brother for approximately eighteen months. More than one year has passed since the making of that determination, which thereafter was upheld by the Appellate Court. See *In re Santiago G.*, supra, 154 Conn. App. 861.

[17] It is well recognized that courts will not lend their assistance to enforce agreements whose inherent purpose is to violate the law; *Parente* v. *Pirozzoli*, 87 Conn. App. 235, 246, 866 A.2d 629 (2005); even to reach what appears to be an equitable result. Id., 250. "Generally, agreements contrary to public policy, that is, those that negate laws enacted for the common good, are illegal and therefore unenforceable." (Internal quotation marks omitted.) Id., 246.

The process of international adoption is highly regulated under federal law. See 42 U.S.C. § 14901 et seq. A major purpose of such regulation is "to protect the rights of, and prevent abuses against, children, birth families, and adoptive parents involved in adoptions (or prospective adoptions) . . . and to ensure that such adoptions are in the children's best interests . . . ." 42 U.S.C. § 14901 (b) (2). Maria G. and the respondent knowingly agreed to engage in a subterfuge to evade the strictures of these adoption laws and achieve more expeditiously their own goals, albeit admirable ones. For the trial court, or this court, to somehow fashion a special rule to respect their wishes as to who should be Santiago's mother would amount to the enforcement of an illegal agreement, contrary to the public policies underlying the adoption laws of both this country and of Guatemala. *Parente* v. *Pirozzoli*, supra, 87 Conn. App. 250. In addition, we agree with the trial court that the trauma that already has been inflicted upon Santiago, through no fault of his own, is unlikely to be remedied by the imposition of yet another traumatic separation from those whom he has grown to love and trust since his removal from Maria G.'s household in October, 2012.